Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/11/2022 09:12 AM CST

State of Nebraska, appellee, v.
Marvin L. Wood, appellant.
___ N.W.2d ___

Filed November 19, 2021.    No. S-20-877.

1. **Trial: Expert Witnesses.** The right of an indigent defendant to the appointment of an expert witness at the State's expense generally rests in the discretion of the trial court.

2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

4. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal; the determining factor is whether the record is sufficient to adequately review the question.

5. **Effectiveness of Counsel: Records: Proof: Appeal and Error.** The record is sufficient to resolve on direct appeal a claim of ineffective assistance of counsel if the record affirmatively proves or rebuts either deficiency or prejudice with respect to the defendant's claims.

6. **Due Process.** There are three factors of procedural due process set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976): First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

7. **Expert Witnesses.** With respect to a defense request for the appointment of an expert independent of the prosecution, the question in each case must be not what field of science or expert knowledge is involved, but, rather, how important the scientific issue is in the case and how much help a defense expert could have given.

8. \_\_\_\_. Some reasonable preliminary showing by the defense justifying its request for the appointment of an expert is necessary because the criminal justice system cannot afford defense experts on demand.

9. **Judges: Expert Witnesses.** The determination of whether a defendant has made an adequate showing of the reasonable necessity for an appointed expert lies within the discretion of the trial judge.

10. **Courts: Words and Phrases.** A district court abuses its discretion when its reasoning or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

11. **Constitutional Law: Expert Witnesses.** Outside the context of psychiatric expertise, to show a constitutional right to appointment of an independent expert at the State's expense, the accused must timely make a preliminary, particularized showing (1) that an issue involving specialized knowledge is likely to be a significant factor in the accused's defense and (2) that there is a reasonable necessity for the defense to have expert assistance in contesting that issue.

12. **Expert Witnesses.** To be a significant factor in an accused's defense, an issue involving specialized knowledge must be one likely to make a difference as to the outcome if the defendant is successful in contesting it.

13. \_\_\_\_. There is a reasonable necessity for appointed expert assistance if the defendant shows some basis for believing the issue can only be strongly contested with the assistance of an appointed expert.

14. **Trial: Expert Witnesses.** Sometimes, under the facts presented, pretrial access to the State's experts and their cross-examination at trial will be adequate to contest the issue.

15. **Expert Witnesses.** In the context of a motion for appointment of an expert, public money need not provide defense counsel with equipment for a "fishing expedition."

16. \_\_\_\_. The defense cannot be asked to support the motion for appointment of an expert with information that can only be found by paying for expert assistance the defendant cannot afford. Neither should the trial court demand defense counsel conduct a lay investigation outside the bounds of what can be expected from an attorney of ordinary training and experience.

17. **Trial: Expert Witnesses.** There must be some particularized preliminary showing by the defendant either that cross-examination of the State's

experts was inadequate to the task of revealing misleading or inadequate information or that there was a reasonable necessity for an independent expert to help the defense prepare for effective cross-examination of the State's experts.

18. **Effectiveness of Counsel: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.

19. **Effectiveness of Counsel: Proof: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order.

20. **Effectiveness of Counsel: Records: Proof: Appeal and Error.** An appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.

21. **Effectiveness of Counsel: Appeal and Error.** In order to preserve a claim of ineffective assistance of trial counsel when new counsel represents the defendant on direct appeal, the appellant must make specific allegations of the conduct the appellant claims constituted deficient performance by trial counsel.

22. **Effectiveness of Counsel: Waiver: Records: Appeal and Error.** Appellate counsel does not waive a claim of ineffective assistance of trial counsel by failing to specifically allege and argue prejudice, because doing so would often require details unlikely to be found in the record or known to the defendant without further inquiry.

23. **Records: Appeal and Error.** An appellate court ordinarily does not scour the record in search of facts that might support an appellant's claim.

24. **Rules of Evidence: Hearsay: Evidence: Witnesses.** Neb. Rev. Stat. § 27-806 (Reissue 2016) allows the credibility of a declarant of a hearsay statement or statement defined in Neb. Rev. Stat. § 27-801(4)(b)(iii), (iv), or (v) (Cum. Supp. 2020)—statements offered against a party that are by a person authorized by the party, by the party's agent or servant, or by the party's coconspirator—to be attacked by any evidence that would be admissible for those purposes if the declarant had testified as a witness, without any opportunity to deny or explain.

25. **Rules of Evidence: Hearsay: Proof.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

26. **Hearsay.** Statements offered to show their effect on the listener are not hearsay.

27. ____. Statements are not hearsay to the extent they are offered for context and coherence of other admissible statements and not for the truth or the truth of the matter asserted.

28. **Witnesses: Impeachment: Prior Convictions.** The basic premise underlying impeachment of a witness by evidence of a prior felony conviction is that any past felony committed by the witness is to some degree relevant to that individual's credibility.

29. **Witnesses.** Credibility of a witness is not at issue when the truth of the assertions are not in dispute.

30. **Judges: Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding relevancy will not be reversed absent an abuse of discretion.

31. **Constitutional Law: Trial: Witnesses.** The Confrontation Clause guarantees an opportunity for effective cross-examination, but not in whatever way or to whatever extent the defendant might wish, and trial judges retain wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

32. **Effectiveness of Counsel: Proof.** To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

33. **Effectiveness of Counsel: Presumptions.** In assessing deficiency in counsel's performance, a court presumes that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

34. **Effectiveness of Counsel.** Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance.

35. ____. Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim.

36. **Effectiveness of Counsel: Appeal and Error.** An appellate court does not use perfect hindsight to criticize unsuccessful trial strategies or second-guess trial strategy.

37. **Expert Witnesses: Words and Phrases.** An expert does not have to couch his or her opinion in the magic words of reasonable certainty, but it must be sufficiently definite and relevant to provide a basis for the fact finder's determination of a material fact.

38. **Expert Witnesses.** A court should exclude an expert's opinion when it gives rise to conflicting inferences of equal probability, so the choice between them is a matter of conjecture.

39. **DNA Testing: Evidence: Jurors.** The potential precision of DNA testing is well known; thus, jurors might wrongly assume, absent evidence of statistical relevance, that any DNA profile match is extremely unlikely and therefore extremely probative.

40. ____: ____: ____. Because of the significance that jurors will likely attach to DNA evidence, the value of inconclusive testing results without statistical relevance is substantially outweighed by the danger that the evidence will mislead the jurors.

41. **Sexual Assault: DNA Testing: Evidence: Jurors.** In an alleged sexual assault described by a female victim as involving her genital area and a male perpetrator, the presence of male DNA near the victim's genital area is relevant to whether the assault occurred as the victim described, and such evidence is not outweighed by a danger of confusing the issues or misleading the jurors even if the DNA is of insufficient quantity or quality to obtain a profile.

42. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

43. **Effectiveness of Counsel: Appeal and Error.** Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.

44. **Lesser-Included Offenses: Jury Instructions: Evidence.** A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense.

45. **Lesser-Included Offenses: Sexual Assault.** Attempted first degree sexual assault of a child is a lesser-included offense of first degree sexual assault of a child.

Appeal from the District Court for Hall County: Andrew C. Butler, Judge. Affirmed.

Robert W. Alexander, Deputy Hall County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

Marvin L. Wood appeals from his conviction of first degree sexual assault of a child. He asserts the trial court erred by refusing to appoint him a DNA expert, sustaining the prosecution's objection to further use of a forensic video to refresh the victim's recollection, and sustaining the State's relevancy objection to his attempt to adduce the fact that the declarant of certain out-of-court statements was a convicted felon. Wood also makes numerous claims of ineffective assistance of his trial counsel, including the failure to adequately support the motion for a DNA expert, the handling of the State's DNA evidence, and the cross-examination of the victim. We affirm the judgment below.

## II. BACKGROUND

With counsel different from trial counsel, Wood appeals his conviction, following a jury trial, of first degree sexual assault of a child pursuant to Neb. Rev. Stat. § 28-319.01(1)(a) (Reissue 2016). Trial counsel did not request that the jury be instructed on a lesser-included offense of attempted first degree assault of a child. The victim was friends with Wood's daughter, and the assault occurred during a sleepover with Wood's daughter at Wood's apartment. The victim was 8 years old at the time of the assault and 9 years old at the time of trial.

### 1. Motion to Employ Expert Witness

Wood was charged in September 2019. Due to laboratory delays in DNA testing, trial was continued to August 3, 2020, with a pretrial conference set for July 2. The DNA test results became available to the defense on June 8. At the July 2 pretrial conference, defense counsel indicated readiness to go

to trial. However, on July 17, Wood moved to continue trial on the grounds that he would be asking the court to provide funds to retain a DNA expert and that the expert Wood wished to hire was not available during the scheduled week of trial. The prosecutor objected, noting it was the first she had heard about the alleged need for a DNA expert. The court granted the continuance, ordering trial to begin on September 14.

On July 27, 2020, Wood moved for the court to provide him "with reasonable funds to employ an independent expert witness in the field of DNA science" and set forth the estimated costs and fees for the expert witness he proposed to hire. As for the need for such an expert, the motion elaborated that "[b]ased on counsel's review of discovery, the State's evidence in the above-styled case appears to consist of testimony of an alleged victim, photographs of her injuries, medical reports and expert testimony." This meant that

> [Wood] has a particularized need for the assistance of an independent expert in the field of DNA science to assess the DNA reports and testing methods completed by the Nebraska Crime Lab and explain if they are consistent with the statement(s) of the alleged victim, proper scientific methods, and the other evidence collected in this case.

Based upon the DNA report completed by the Nebraska State Patrol Crime Laboratory, "it has become apparent further analysis is needed regarding test results and methods of testing used by the Nebraska State Patrol Crime Laboratory." Finally, the motion set forth that "[c]ounsel for [Wood] lacks the necessary expertise to question the DNA reports provided by the State in regards to DNA testing methods and DNA results to determine whether the alleged victim's statements and testing are consistent with the DNA evidence that may exist." And "[c]ounsel lacks expertise regarding testing methodology and if such testing was conducted according to the recognized standards." Therefore, trial counsel was "in need of the assistance of an expert witness in the DNA field to assist in evaluating these matters."

At hearings on the motion, trial counsel introduced evidence to support Wood's indigent status. The court acknowledged the evidence demonstrated Wood was indigent. Trial counsel explained Wood had used all his assets in retaining counsel that was continuing representation on a pro bono basis. The only other evidence offered by trial counsel was a copy of the motion and its attached cost estimate for the proposed expert. Trial counsel acknowledged that the court had allowed Wood to employ an expert sexual assault nurse examiner to testify on behalf of the defense and that the State had allowed the defense to have access to its DNA expert from the Nebraska State Patrol Crime Laboratory. Nevertheless, trial counsel became aware of the need for a DNA expert after witness preparation occurred with Wood's expert sexual assault nurse examiner in mid-July. Trial counsel argued that "based on some of the conclusions and the methodology that was used in the creation of the DNA report, we're needing a DNA expert" "to look at how these tests were performed." Trial counsel elaborated:

> We believe it's necessary to employ a DNA expert to help the jury to understand what the DNA evidence in this case means. Specifically, I believe the evidence will show that there was found on the alleged victim's underwear a mixture of DNA from three people, a 4 percent portion of which appears to be that of . . . Wood.
>
> However, the amount of DNA, the amount of cells where it was found, to explain to the jury how that actually exists in life, whether it's touch DNA, what kind of cells, all of that, Judge, I'm not an expert in DNA. The jury is not an expert in DNA. But I believe it's important that we have someone who can explain to them exactly what this means.
>
> The State will have an expert that does all of that and explain how things were tested and how it was found, why they believe that it's . . . Wood's DNA on those underwear, but the jury also needs to understand the facts in totality.

> Because in speaking to our expert, talking about markers, talking about whether it's one in a billion or one in a trillion or one in 500,000, all these probabilities of who it could be, how many cells, what kind of cells, whether it's touch DNA, seminal fluid or semen, all of these things matter. It's something we don't have the expertise to explain to the jury.

Trial counsel also described an alleged phone call with the Nebraska State Patrol Crime Laboratory in which it was disclosed that no male DNA was detected in any of the swabs and the biologist "didn't understand the findings that were in that lab report." Trial counsel summarized that the request was for the court to "allow us to hire this expert and to use her both for review of the trial to help educate us as to DNA and its meaning, and then to educate the jury and educate a layman exactly what that means."

The court denied the motion. It observed that "virtually no evidence to support the motion was offered" and that "[t]he reasons that prompted an 'apparent' need for an expert witness remain largely unspecified." It then reasoned:

> The State has indicated that it intends to call upon an expert in genetic analysis employed by the Nebraska Crime Lab. While this expert would technically be considered the State's witness, this Court finds no evidence to suggest that defense counsel is deprived of the right to cross examination. Likewise, this Court possesses no knowledge that would indicate that defense counsel is incapable of amassing sufficient independent research on the subject that would equip defense counsel with the relevant knowledge and resources required to conduct such cross examination.

The court concluded that it was not "required to provide [Wood] with the tools needed for a 'fishing expedition'" and it was "confident that defense counsel in this case has the intellectual capacity, resources, and creativity required to mount an exceptionally comprehensive cross examination of the State's proposed expert witness."

## 2. Mother's Testimony

The first witness called by the State was the victim's mother. She testified that she was in a romantic relationship with Matthew Price, the owner of an auto shop where Wood worked, and that her daughter and Wood's daughter were friends. The two girls often played together at the shop where Wood was employed.

The mother testified that the morning after the victim spent the night at Wood's apartment for a sleepover with Wood's daughter, she was informed the victim would be going to Lincoln, Nebraska, with Wood and his daughter because Wood had to get a title to a vehicle. These arrangements were unexpected and were made without her input. Later that day, Wood dropped the victim off at a parking lot near Price's softball game that the mother was attending. Wood's daughter was not with him. The victim exited Wood's vehicle first, holding an outfit Wood had purchased for her in Lincoln. When Wood exited the vehicle, the first thing he said was, "'She's been a fucking brat all day.'" Price invited Wood to stay for the game, but Wood declined.

The mother and the victim sat in the dugout to watch the game. The mother testified that, since the victim's arrival, the victim "was being really quiet," "clinging on to me pretty tight," and "wasn't saying anything when anybody was around at all." The mother asked the victim if something was wrong. The victim told her mother she needed to tell her a "secret." After the victim told her the "secret," the mother immediately "hollered to the field," telling Price she needed to leave. They took the victim immediately to a hospital. The mother told the victim they needed to see a doctor because of what happened. The victim said, "'Okay.'" She "was crying in the car the whole time."

There was a delay in finding someone to come to the hospital to examine the victim. The mother testified that while they were waiting for the victim to be examined, the victim needed to use the restroom. The mother accompanied her. After the

victim wiped herself, she showed her mother the toilet paper, because it had blood on it. The mother conveyed this information to a nurse at the hospital. The mother explained that before that day, the victim had not complained of experiencing any irritation in her vaginal area, and that the victim normally tells her "right away" if something like that is wrong.

They waited about 5 hours while the hospital attempted to set up a medical examination, but it was not able to do so. The entire time, the victim kept wearing everything she had worn since being dropped off with her mother, because the staff "didn't want to contaminate anything." This included the underwear she had worn during the sleepover.

After the victim was released from the hospital, her mother and Price took her to a child advocacy center. The victim was quiet on the ride there. The victim was asked to change her underwear and give the underwear she was wearing to the interviewer at the child advocacy center, who put them in a paper bag. The victim was interviewed, and then they went home. The interview had lasted until approximately 1 a.m.; they had arrived there late in the evening.

The victim was finally able to be examined by a pediatrician 2 days after she spent the night at Wood's apartment.

The mother described changes in the victim's behavior. Her normally "pretty happy kid" had become more quiet and would "get angry about small things." The victim has two siblings. While the victim used to occasionally shower with her younger sister when there was not enough time for all three siblings to take separate showers, she no longer did. The victim did not want to get dressed in front of anyone. When it was time to go to bed, the victim "would start crying that she didn't want to be, like, in her room by herself" and she "would wake up crying a lot." This was not behavior the mother had observed before the victim spent the night at Wood's apartment.

During trial counsel's cross-examination of the mother, she was asked whether she knew Price was a convicted felon. The prosecution objected, and counsel had an in-chambers

conference in which the prosecution explained its objection was on the grounds of relevance and improper character evidence. Defense counsel argued the evidence supported the theory that Price and the victim's mother "got together and chose to have [the victim] make up this story." The court sustained the objection, explaining that, at that time, there was no evidence supporting the relevancy of Price's criminal history. The court explained that it would retain the mother for added testimony later, if defense counsel wished. Defense counsel said nothing further on the matter. The jury was instructed to disregard the question regarding Price's criminal history.

The mother's testimony during direct examination had referred to approximately five general statements by Price. At one point in describing the events leading up to the sleepover, she said Price had told her that because the victim had been good all day, he was going to let her go to the sleepover. She also described how Price had told her that Wood took the victim directly from the shop to the sleepover at his apartment. Price had informed the mother that the victim was going with Wood and Wood's daughter to Lincoln the day following the sleepover. The mother testified as to how Price had invited Wood to stay and watch the softball game. Finally, when the mother later yelled at Price that she needed to leave, she testified Price asked her, "'What's wrong?'"

### 3. Law Enforcement Officer Testimony

A law enforcement officer who had met the victim at the hospital testified at trial. She described the victim as "withdrawn" and "in shock." The officer testified she became aware at the hospital that blood had been observed on a piece of toilet paper after the victim used the restroom. She elaborated that she heard multiple medical professionals speaking about it.

The officer went to the child advocacy center when the victim did, collected the underwear, and placed it into evidence. The officer later went to Wood's apartment, and Wood accompanied the officer to the police station for an interview.

In the interview, Wood said he had gone to his daughter's room to comfort the victim who was scared of a severe storm that occurred that night. The officer affirmed on cross-examination that a large storm had occurred on the night in question.

The officer testified that Wood said he brought the victim to the sofa bed in the living room, which had been turned into a bed; gave the victim a "tablet [computer] for entertainment"; and lay down next to her and fell asleep. Wood denied any physical contact other than putting his arm around her for comfort. At some point during the interview, Wood expressed that the victim had put on only a shirt and underwear to wear to bed and that he thought it was unacceptable she was not wearing pants. Further, Wood said that sometimes the victim would climb all over him, "but she sets those boundaries." Wood stated that when he woke up on the sofa bed, "she was right there, that she sets those boundaries."

### 4. DNA and Serum Testing of Clothing and Medical Examination Swabs

A forensic biologist in the DNA unit of the Nebraska State Patrol Crime Laboratory testified as to the procedures and results of DNA and serum testing of the victim's clothing and of swabs taken during the medical examination.

### (a) Serum Testing

The biologist tested the items from the sexual assault medical examination kit, which included two vaginal swabs, two external genital swabs, and two oral evidence swabs. Serology testing did not detect the presence of semen in any item contained in the kit.

### (b) DNA Processing of Examination Swabs and Exhibit 18

The biologist then processed all the examination swabs for DNA. Exhibit 18, entered into evidence by the State without objection, is the laboratory report signed by the biologist. It shows that no semen was found in the swabs and that DNA

testing was performed on them. It shows that DNA processing of the DNA samples in both the two vaginal swabs and the two oral evidence swabs was stopped "due to the insufficient quantity of male DNA detected." The victim's DNA was found on the external genital swabs, while Wood was excluded as a contributor to the DNA profile detected.

The biologist explained that the aspect of the report showing processing of the two vaginal swabs and the two oral swabs was stopped, due to the insufficient quantity of male DNA detected, meant that she "was not able to detect the presence of male DNA on the sample." The State then asked the biologist, "Can you say with certainty that there was no male DNA on the two vaginal swabs?" She responded, without objection, "I couldn't say definitively, no, there's no DNA present. It just wasn't in great enough amounts to be detected using this form of testing." With respect to the oral swabs, the biologist again confirmed, without objection, she was not able to say with absolute certainty whether or not there was male DNA on them.

The biologist was also asked about the external genital swabs. She explained that, referring to some of the worksheets generated as a byproduct of her testing during the quantitation portion of the DNA process, she had detected the presence of both male and female DNA. This information is not reflected in the report. The biologist testified that, as stated in the report, Wood's profile was excluded from that sample, while the victim's DNA was included. The biologist explained Wood was excluded because she was not able to find a profile of that male DNA to compare with other DNA profiles. "In samples like this where there's a greater female present than male, the female can essentially drown out any potential load level of male DNA."

(c) Y-STR DNA Testing of Examination
Swabs and Exhibit 20

The biologist testified that in a further attempt to find a profile in the male DNA she had detected, she sent the

external genital swabs for "Y-STR testing," which can ignore the female DNA and just focus on the male DNA. This can make it possible to obtain a DNA profile to use for comparison purposes. The Y-STR DNA testing was performed by one of the supervisors in the biology unit of the Nebraska State Patrol Crime Laboratory. The biologist reviewed the report, marked as exhibit 20, before testifying further. She then testified that the Y-STR DNA testing was, like the DNA testing conducted by herself, unable to detect a male DNA profile. As a result, the male DNA found could not be compared with any other known DNA profiles for comparison purposes.

The State did not offer exhibit 20 into evidence. But on cross-examination, trial counsel offered exhibit 20 into evidence and it was received. The biologist testified that the supervisor's report, marked as exhibit 20, was a true and accurate copy and that she recognized the supervisor's signature on it.

Exhibit 20 is a short report that concludes no Y-STR DNA profile was found.

(d) Epithelial DNA on Underwear and Exhibit 17

The biologist also performed testing on the victim's underwear that she wore at the time of the incident, which testing did not detect semen. Swabs for epithelial, or "touch," DNA on the waistband and crotch area of the underwear were tested, and a mixture of DNA originating from three individuals was found. The victim was a major contributor to that mixture.

Testing included Wood as one of the minor contributors to the mixture. Two percent of the DNA mixture was from an unknown person. The results of this DNA testing were entered into evidence as exhibit 17.

During cross-examination, the biologist explained that touch DNA could be transferred directly or indirectly by touching things a person has touched. She also explained that one would expect to find the touch DNA of a person on surfaces where that person lives.

## 5. Victim's Testimony

The victim testified that the last time she spent the night at Wood's apartment, she had slept in the top bunk of a bunk bed in her friend's bedroom. She testified that Wood woke her up. Wood accompanied her to the living room, where a sofa bed had been made into a bed. The victim described that while she stood by the sofa bed, Wood removed her pajama pants. She admitted she was unsure if she was wearing a nightgown instead of pants. The victim described that Wood removed her underwear. Wood lay down on the sofa bed with the victim and unzipped and pulled his pants down "a little." The victim testified Wood lay on top of her and "put[] his finger in my private part." They eventually went to Wood's bedroom, where the victim described "he put his private in mine."

The victim described that during the shopping excursion the following day, Wood said he did not want the victim "to tell" because she and Price "were his only friends." The victim could not remember if she was wearing the new clothes the following day when she was brought back to her mother.

The victim explained that she told her mother what had happened and that they went to the hospital. At the hospital, her mother accompanied her when she had to use the bathroom, and her "pee" was light red and it hurt when she urinated. The victim also explained that she was wearing the same underwear she had worn when Wood had woken her up.

### (a) Refreshing Recollection With Video

Trial counsel had moved before trial for the release of the child advocacy center video of the victim's forensic interview, but had then withdrawn this request, explaining, "We needed to have it formatted in a way we could go back and forth in time in case we need to refresh the memory of the [victim]. We were able to do that without the necessity of releasing it to anyone." On cross-examination, the victim testified she did not remember if she had taken clothes to Wood's apartment or if she had taken a shower or bath while there. Most of the

cross-examination centered on the victim's prior statements in the forensic interview and deposition.

At one point, trial counsel asked about the interview and the fact that it was just the victim and the interviewer present in the room. When trial counsel then asked questions such as, "do you remember where you told them that this took place?," a series of questions and answers revealed the victim's confusion about whether she was being asked about the room where the interview had taken place or the location where the assault had taken place.

She eventually testified she had told the interviewer the incident started in her friend's room, moved to the living room, and then to Wood's bedroom. At that point, in chambers, defense counsel was permitted to show the victim a portion of the video of the interview. Upon returning to the courtroom, the victim stated that the video had refreshed her memory.

The victim confirmed she had told the interviewer that Wood and she went from her friend's bedroom to Wood's bedroom. She had not told the interviewer anything with Wood had occurred in the living room.

Trial counsel also confronted the victim with her deposition testimony that Wood had taken her to the living room, where all the events described occurred. She did not testify in her deposition that she had gone to Wood's bedroom.

Trial counsel proceeded to ask the victim if she remembered what she had told the interviewer with respect to whether Wood took his clothes off or only unzipped his pants. When the victim said she did not remember, she was again taken in chambers where she watched a portion of the video of her interview. Upon returning to the courtroom, the victim testified she had told the interviewer that Wood had taken his clothes off.

Next, trial counsel confronted the victim with her statement in her deposition that Wood had placed her into his bed. Trial counsel asked if she remembered what she had said in this regard in her interview at the child advocacy center. She did not remember. But before the court ruled on trial counsel's

request to take the victim back in chambers to watch a portion of the video, an off-the-record discussion between counsel and the court took place, after which the jury was dismissed until the continuation of trial the following day.

### (b) Plan to Have Victim Watch Entire Video

The court articulated that a plan had been made for the victim to watch the entirety of the interview video with her guardian ad litem and have the transcript of her deposition read to her before testifying the next day. The court explained this was to avoid the "up-and-down issue that we have been having with this."

The following morning, however, the prosecution explained the victim had her deposition read to her, but only watched about 16 minutes of the 45-minute interview before the guardian ad litem decided to stop it. The guardian ad litem explained she became "very concerned with [the victim's] demeanor and a change in her demeanor that I thought she became just visibly upset and kind of shrunken down into her chair."

### (c) Objection and Ruling That Video
### Could Not Be Used

The prosecution stated that it had reflected upon "what happened yesterday" and that, after some research, it decided to motion the court to prohibit the defense from using the interview video to refresh the victim's recollection. The prosecution relied on the fact that Neb. Rev. Stat. § 27-612 (Reissue 2016) refers only to writings, as well as the case of *State v. Weathers*, 304 Neb. 402, 935 N.W.2d 185 (2019). Even if refreshing the victim's recollection with the video were permissible, the State argued the procedure used did not comport with § 27-612. Lastly, the prosecution explained it believed counsel was attempting to impeach the victim under the guise of refreshing her recollection.

According to the prosecution, when the attempted impeachment did not work because the victim did not remember what she had said, the rules contemplated impeachment through

extrinsic evidence, not by using extrinsic evidence to refresh a victim's recollection so she could then impeach herself. The prosecution argued there were other means to impeach the victim's testimony without making her watch the interview video. For example, the defense could call another witness who was present at the interview and impeach the witness' testimony by adducing the other witness' testimony about what was said.

Trial counsel responded no notice was given that this was to be discussed and the matter was believed to be settled. That said, "Certainly I have no issue using her prior statements against her without her being refreshed. Probably would have been easier for her." But trial counsel also pointed out that Neb. Rev. Stat. § 27-613 (Reissue 2016) describes giving a witness the opportunity to explain or deny a prior inconsistent statement. Trial counsel then argued that "for her to simply say I don't remember when she made an inconsistent statement is not acceptable. We would then be unable to delve into it by actually playing that portion of the video to the jury."

The court ruled that the victim's recollection could no longer be refreshed by use of the interview video, nor could the video be played for the jury as extrinsic evidence to impeach the victim. The court said:

> Yes, going forward, the moment [the victim] indicates she doesn't remember, she doesn't remember. That is her answer. You do have the opportunity through [§ 27-]613 for the inconsistent statements with extrinsic evidence, but that will not include the playing of that video or the refreshing of her recollection with that video.
>
> We still have the deposition, which that has been read to her this morning, and you can question regarding that.

Trial counsel did not respond to this pronouncement and did not ask to make an offer of proof as to any impeachment believed to be thereby impeded.

### (d) Resumption of Cross-Examination

When cross-examination resumed, the victim admitted that she had told defense counsel in her deposition that she had

dressed herself after the assault, while in her testimony at trial she said Wood put her clothes on her. Defense counsel also questioned the victim about the details of her shopping trip with Wood the following day.

### 6. Testimony of Forensic Interviewer

The forensic interviewer testified about her interview of the victim the evening after the assault. She said that she was trained in the disclosure process children typically use when disclosing traumatic events and that disclosure does not usually happen all at once. Also, a child may not disclose all the details involved in the assault during the forensic interview.

On cross-examination, trial counsel asked the interviewer where the victim had told her the incident had taken place. The interviewer answered in the bedroom. Then trial counsel asked, "Let's talk first about [Wood's] bedroom. Is that where she said the, I'll call it touching, took place?" The prosecution objected on the grounds of hearsay and improper impeachment. In a discussion at the bench, the trial counsel asserted the question was not hearsay because it was asked to elicit the prior inconsistent statements for purposes of impeachment. The prosecution responded:

> He is only able to impeach specific statements that [the victim] testified to when she testified in this court hearing, and asking this witness to have her essentially recount everything that [the victim] told her is above and beyond impeachment. He needs to be specific, needs to ask her — I mean, we haven't even said a specific statement he's attempting to impeach. To use [the interviewer] to reiterate the entirety of the interview is not confined enough to qualify as improper impeachment.

Trial counsel withdrew the question and agreed to ask a more specific question. The following cross-examination then took place:

> Q Did [the victim] tell you that the incident took place in [Wood's] room?

A Part of it, yes.

Q Did [the victim] tell you that in [Wood's] room [he] put his private parts in her private parts?

A Yes.

Q Did [the victim] tell you that [Wood] took her back to her bed, the bunkbed, got in bed with her and kissed her?

A Yes.

. . . .

Q [The victim] then said that [Wood] got out of the top bunk and she went to sleep, correct?

A Yes.

. . . .

Q Did [the victim] tell you that . . . Wood took off his clothes?

A Yes.

On redirect, the interviewer testified that children disclosing traumatic events do not always disclose the facts chronologically.

## 7. Sexual Assault Examination

The pediatrician who performed the victim's sexual assault examination testified the victim had disclosed she had some burning and some blood when she urinated the night before, but those issues had resolved by the time of the examination. The pediatrician testified that the victim eventually became uncooperative when the pediatrician attempted to swab the outside of the victim's vaginal opening and that the pediatrician was unable to swab fully.

All other aspects of the sexual examination kit were completed successfully. The pediatrician also conducted a physical examination for injuries. She photographed the area, but explained the photographs could have been better had the victim been more cooperative when they were taken. The victim at that point had become "uncomfortable."

The pediatrician testified that she observed during the physical examination "an extreme amount of redness and irritated tissue from about 3 o'clock going around to about 9 o'clock on the face of a clock." She explained, "Lots of young girls have redness down there, but this was impressive, much more than you see on a standard exam of a child."

The pediatrician also observed a superficial, vertical laceration at about the 9 o'clock position and in the folds of the labia minora adjacent to the vaginal opening. The tissue of the vagina heals very quickly; therefore, she concluded the observed injuries were recent.

The victim's injuries, the pediatrician explained, could have caused bleeding when they first occurred, as well as burning during urination. Further, there would not necessarily be blood on the victim's underwear given the injuries and reported bleeding. Rather, "[t]he way that it's hidden up in these tissues," it was possible that "when [she] wiped over it, it opened it up again or that that blood had sort [sic] been tucked up in that tissue."

The pediatrician stated the observed injuries could be consistent with digital or penile penetration of the vagina. On cross-examination, the pediatrician conceded it was "possible" the observed injuries were caused by acts that were not "criminal or nefarious."

### 8. DEFENSE EXPERT WITNESS

The defense called as an expert witness the sexual assault nurse examiner, who was also a nurse practitioner with a doctorate degree in nursing. The expert works as the assistant manager of a forensic assessment consultation and treatment program. She had reviewed the police records, a transcript of the forensic interview, the medical records from the hospital, and the medical records from the forensic examination.

The expert testified that redness is a nonspecific finding that "really holds no significance to the exam." She observed no physical injuries from the photographs taken during the examination.

The expert stated that if there was blood observed after urinating, she would expect blood cells would be detected in a urinalysis. A urinalysis had been completed at the hospital. The expert stated that if she remembered correctly, "the blood was negative, the urine was clear. And then I believe there were minimal whites, which is white blood cells, and then red blood cells were present."

Based on her review of the records, the expert opined there was no injury indicative of sexual abuse. On cross-examination, the expert admitted that it is possible for a sexual assault not to cause any injuries.

### 9. Jury Instruction Conference and Closing Arguments

Wood's trial counsel did not object to any of the jury instructions or the verdict form and did not submit any additional proposed instructions. During closing arguments, the prosecution pointed out the victim's physical injuries and made the following argument with respect to the DNA evidence:

> We had DNA evidence. Sure, I think it was pointed out by one of the defense attorneys during their cross-examination maybe in 100 years we'll finally catch up to CSI and all of the other television shows. Fair enough. But we know that there was male DNA on the external genital swabs that were collected from [the victim] during [the victim's] exam. There shouldn't be male DNA on the external area of an eight-year-old's vagina.
>
> We also know that . . . Wood's DNA is on [the victim's] underwear, the underwear she was wearing immediately before, immediately after the assault happened.

The prosecution also pointed out that disclosure of a sexual assault is a process that does not necessarily happen all at once or in a perfect chronological retelling. The prosecution pointed out that the victim was a child who did not know about sexual intercourse and who had no experience to assist in processing this trauma. Despite this, she was expected to talk about the

assault and then have a pediatrician examine her "on a part of her body that isn't normal for an eight-year-old girl to have examined." Lastly, the prosecution described the testimony indicating the victim's changes in behavior and demeanor after the assault.

Trial counsel emphasized in closing arguments the burden of proof. Trial counsel pointed out that the victim had told three different stories and that there were multiple inconsistencies in her statements about the alleged assault. In fact, trial counsel had counted the inconsistencies to be "into the teens." Trial counsel asserted, "It's easy to remember the truth. It's very hard to remember a lie."

Trial counsel also emphasized that its expert found no injury demonstrating sexual assault and that the presence of epithelial cells in underwear worn overnight while in Wood's "messy apartment" was not incriminating, given that the cells can be transferred via surfaces.

## III. ASSIGNMENTS OF ERROR

Wood assigns that the district court erred when it (1) denied his motion that a DNA expert be appointed, (2) refused to allow Wood to refresh the victim's recollection by having her watch the video of her forensic interview, and (3) prohibited Wood from asking the victim's mother if Price, who was Wood's employer, was a convicted felon.

Wood assigns that trial counsel was ineffective in (1) failing to request a lesser-included instruction of attempted first degree sexual assault of a child, (2) "Failing to Investigate the Case Fully," (3) presenting "Virtually No Evidence in Support of his Motion to Employ an Expert Witness and for Payment of the Same," (4) failing to object to "Clearly Irrelevant and Unduly Prejudicial Testimony About DNA Testing Results with No Statistical Significance," (5) failing to object to the biologist's "Testimony" regarding the Y-STR DNA testing conducted by her supervisor, (6) offering exhibit 20, (7) "in

his Cross-Examination" of the victim, and (8) "in his Cross-Examination" of the forensic interviewer.

## IV. STANDARD OF REVIEW

[1] The right of an indigent defendant to the appointment of an expert witness at the State's expense generally rests in the discretion of the trial court.[1]

[2,3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[2] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[3]

[4,5] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal; the determining factor is whether the record is sufficient to adequately review the question.[4] The record is sufficient to resolve on direct appeal a claim of ineffective assistance of counsel if the record affirmatively proves or rebuts either deficiency or prejudice with respect to the defendant's claims.[5]

## V. ANALYSIS

Wood asserts on appeal three errors by the trial court and numerous alleged acts of ineffective assistance by his trial counsel. Wood argues the court erred by denying his pretrial motion that a DNA expert be appointed and, alternatively,

---

[1] *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000); *State v. Quezada*, 20 Neb. App. 836, 834 N.W.2d 258 (2013).

[2] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[3] *Id.*

[4] See *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019).

[5] See *id.*

that defense counsel was ineffective for presenting "Virtually No Evidence" in support of the motion for appointment of a DNA expert. Wood argues the court erred during trial in prohibiting defense counsel from eliciting testimony from the victim's mother that Price was a convicted felon in order to impeach Price's out-of-court statements. Wood argues the trial court erred by sustaining the prosecution's objection to any further use of the forensic video to refresh the victim's recollection. Relatedly, he asserts defense counsel was ineffective in the manner the victim was cross-examined. Defense counsel was also allegedly ineffective in cross-examining the forensic examiner about the victim's interview statements. Wood claims defense counsel failed to "Investigate the Case Fully" and mishandled the evidence relating to the DNA testing of the swabs from the medical examination. Finally, Wood argues defense counsel was ineffective by failing to request an instruction on the lesser-included offense of attempt.

### 1. Failure to Appoint DNA Expert and Alleged Ineffectiveness in Trial Counsel's Lack of Support for Its Motion

The right of an indigent defendant to the appointment of an expert witness at the State's expense generally rests in the discretion of the trial court.[6] Neb. Rev. Stat. § 27-706(1) (Reissue 2016) provides, in part:

> The judge may on his own motion or on the motion of any party enter an order to show why expert witnesses should not be appointed, and may request the parties to submit nominations. The judge may appoint any expert witnesses agreed upon by the parties, and may appoint witnesses of his own selection.

Under § 27-706(2), "Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the judge may

---

[6] *State v. Baue, supra* note 1.

allow. The compensation thus fixed is payable from funds which may be provided by law in criminal cases . . . ."

We have repeatedly held that the right of an indigent defendant to the appointment of an expert witness at the State's expense generally rests in the discretion of the trial court.[7] Wood asserts the trial court abused its discretion because denying his request for appointment of a DNA expert violated his rights to procedural due process.

The U.S. Supreme Court has said that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense," and that "justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake."[8] The Court stated, "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain he has access to the raw materials integral to the building of an effective defense."[9] The State need not purchase for the indigent defendant all the assistance wealthier counterparts might buy,[10] but the "'basic tools of an adequate defense or appeal'" must be provided to those defendants who cannot afford to pay for them.[11]

In *Ake v. Oklahoma*,[12] and *McWilliams v. Dunn*,[13] the Court held that an indigent defendant has a constitutional right

---

[7] *Id.*

[8] *Ake v. Oklahoma*, 470 U.S. 68, 76, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

[9] *Id.*, 470 U.S. at 77.

[10] See *id.* See, also, *Ross v. Moffitt*, 417 U.S. 600, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974).

[11] *Ake v. Oklahoma, supra* note 8.

[12] *Id.*

[13] *McWilliams v. Dunn*, ___ U.S. ___, 137 S. Ct. 1790, 198 L. Ed. 2d 341 (2017).

to access to an expert in psychiatry after the defendant has made a preliminary showing that the defendant's sanity at the time of the offense is "likely" to be "a significant factor in his defense."[14] It found the need for an independent expert psychiatrist necessarily followed from a showing of such materiality, because psychiatry is not an "exact science" and "psychiatrists disagree widely and frequently," so jurors "must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party."[15] Thus,

> without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high.[16]

The U.S. Supreme Court elaborated that a qualified mental health expert must be "sufficiently available" to the defense and "independent from the prosecution" in order to effectively "'assist in evaluation, preparation, and presentation of the defense.'"[17] While the Court has recognized the simplest way to achieve this goal is to provide a qualified expert retained specifically for the defense team, it has declined to address whether appointment of an expert for the defense is always required when sanity is likely to be a significant factor in the accused's defense.[18]

---

[14] *Ake v. Oklahoma, supra* note 8, 470 U.S. at 86.

[15] *Id.*, 470 U.S. at 81.

[16] *Id.*, 470 U.S. at 82.

[17] *McWilliams v. Dunn, supra* note 13, 137 S. Ct. at 1800, quoting *Ake v. Oklahoma, supra* note 8.

[18] *McWilliams v. Dunn, supra* note 13.

[6] The Court explained that access to an expert with State funds is at its foundations analyzed under the three factors of procedural due process set forth in *Mathews v. Eldridge*[19]: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[20] While the Court recognized the State may suffer some financial burden in providing defense access to an independent psychiatrist at its expense, in circumstances where a defendant's mental condition is at issue and relevant to culpability or punishment, this financial burden is outweighed by both the State's and the defendant's interests in fair and accurate adjudications of criminal cases—given the complexity of the determination for which such expert testimony can be crucial.[21]

These procedural due process standards have since been applied by Nebraska courts,[22] as well as by both federal

---

[19] *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[20] *Id.*

[21] See *Ake v. Oklahoma, supra* note 8.

[22] See, *State v. George*, 264 Neb. 26, 645 N.W.2d 777 (2002); *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998), *abrogated on other grounds, State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012); *State v.* Grimes, 246 Neb. 473, 519 N.W.2d 507 (1994), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993), *overruled on other grounds, State v. Burlison, supra* note 22; *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Lesiak*, 234 Neb. 163, 449 N.W.2d 550 (1989); *State v. Suggett*, 200 Neb. 693, 264 N.W.2d 876 (1978); *State v. Quezada, supra* note 1; *State v. Turco*, 6 Neb. App. 725, 576 N.W.2d 847 (1998); *State v. Doremus*, 2 Neb. App. 784, 514 N.W.2d 649 (1994).

courts[23] and courts in other states,[24] to a variety of other fields of expert knowledge shown likely to be a significant factor to the accused's defense. The U.S. Supreme Court has not spoken on the question of other areas of scientific knowledge, declining in *Caldwell v. Mississippi*[25] to consider a trial court's refusal to appoint fingerprint and ballistics experts, because the defendant had "offered little more than undeveloped assertions that the requested assistance would be beneficial."

[7] We agree with the Eighth Circuit that "[t]here is no principled way to distinguish between psychiatric and non-psychiatric experts," inasmuch as an expert in any field of expertise may, under the circumstances, be a "'basic tool[] of an adequate defense'" or appeal.[26] With respect to a defense request for the appointment of an expert independent of the prosecution, "[t]he question in each case must be not what field of science or expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given."[27]

---

[23] See, e.g., *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985); *Scott v. State of La.*, 934 F.2d 631 (5th Cir. 1991); *Terry v. Rees*, 985 F.2d 283 (6th Cir. 1993); *Little v. Armontrout*, 835 F.2d 1240 (8th Cir. 1987); *Dunn v. Roberts*, 963 F.2d 308 (10th Cir. 1992); *Moore v. Kemp*, 809 F.2d 702 (11th Cir. 1987).

[24] See, e.g., *Ex parte Moody*, 684 So. 2d 114 (Ala. 1996); *Doe v. Superior Court*, 39 Cal. App. 4th 538, 45 Cal. Rptr. 2d 888 (1995), *disapproved on other grounds, James G. v. Superior Court*, 80 Cal. App. 4th 275, 95 Cal. Rptr. 2d 135 (2000); *Bright v. State*, 265 Ga. 265, 455 S.E.2d 37 (1995); *People v. Lawson*, 163 Ill. 2d 187, 644 N.E.2d 1172, 206 Ill. Dec. 119 (1994); *State v. Coker*, 412 N.W.2d 589 (Iowa 1987); *State v. Moore*, 321 N.C. 327, 364 S.E.2d 648 (1988); *State v. Mason*, 82 Ohio St. 3d 144, 694 N.E.2d 932 (1998); *Rogers v. State*, 890 P.2d 959 (Okla. Crim. App. 1995); *State v. Rogers*, 313 Or. 356, 836 P.2d 1308 (1992); *Rey v. State*, 897 S.W.2d 333 (Tex. Crim. App. 1995); *Husske v. Com.*, 252 Va. 203, 476 S.E.2d 920 (1996).

[25] *Caldwell v. Mississippi, supra* note 23, 472 U.S. at 323-24, n.1.

[26] *Little v. Armontrout, supra* note 23, 835 F.2d at 1243.

[27] *Id.*

### (a) No Preliminary Showing of
### Necessity Supporting Motion

[8] The State does not contest that defendants may, depending on the circumstances, have a procedural due process right to appointment of a DNA expert. It asserts the district court did not abuse its discretion in finding Wood failed to demonstrate the need for such an appointment. We agree. "Courts uniformly stress that the showing of need must set forth in detail what assistance is being requested and why it is needed."[28] Some reasonable preliminary showing by the defense justifying its request for the appointment of an expert is necessary because the criminal justice system cannot afford defense experts on "demand."[29]

[9,10] The determination of whether a defendant has made an adequate showing of the reasonable necessity for an appointed expert lies within the discretion of the trial judge.[30] A district court abuses its discretion when its reasoning or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[31] The district court did not abuse its discretion in finding that Wood's trial counsel did not make this preliminary showing.

[11,12] Outside the context of psychiatric expertise, to show a constitutional right to appointment of an independent expert at the State's expense, the accused must timely make a preliminary, particularized showing (1) that an issue involving specialized knowledge is likely to be a significant factor in the accused's defense and (2) that there is a reasonable necessity for the defense to have expert assistance in contesting that

---

[28] 3 Wayne R. LaFave et al., Criminal Procedure § 11.2(e) at 745 (4th ed. 2015).

[29] See *Moore v. Kemp, supra* note 23, 809 F.2d at 712.

[30] See, e.g., *Husske v. Com., supra* note 24.

[31] See *State v. Ralios*, 301 Neb. 1027, 921 N.W.2d 362 (2019).

issue.[32] To be a significant factor, the issue must be one likely to make a difference as to the outcome if the defendant is successful in contesting it.[33]

[13] There is a reasonable necessity for appointed expert assistance if the defendant shows some basis for believing the issue can only be strongly contested with the assistance of an appointed expert.[34] A general appeal to the complexity of the material issue involving specialized knowledge is insufficient to show need for the appointment of an expert unless the defendant demonstrates the very nature of the scientific field suggests ground for challenge—for instance, that it is one filled with controversy and disputes over methodology.[35] On the other extreme, where the scientific methodology is well established and its application is viewed as largely mechanical, the defense must show a specific reason, such as the prosecution expert's bias or incompetence, for concluding that a defense expert is needed to assist in a successful challenge to such scientific evidence.[36]

---

[32] See, e.g., *Cade v. State*, 658 So. 2d 550 (Fla. App. 1995); *Isaacs v. State*, 259 Ga. 717, 386 S.E.2d 316 (1989); *State v. Dahl*, 874 N.W.2d 348 (Iowa 2016); *Sommers v. Com.*, 843 S.W.2d 879 (Ky. 1992), *abrogated on other grounds, Abbott, Inc. v. Guirguis*, 626 S.W.3d 475 (Ky. 2021); *State v. Allen*, 77 N.C. App. 142, 334 S.E.2d 410 (1985); *Tibbs v. State*, 819 P.2d 1372 (Okla. Crim. App. 1991); *Davis v. State*, 905 S.W.2d 655 (Tex. App. 1995); *Husske v. Com., supra* note 24. See, also, 3 LaFave et al., *supra* note 28.

[33] See 3 LaFave et al., *supra* note 28. See, also, e.g., *Dunn v. State*, 291 Ark. 131, 722 S.W.2d 595 (1987); *Stafford v. Love*, 726 P.2d 894 (Okla. 1986).

[34] See 3 LaFave et al., *supra* note 28 (and cases cited therein). See, also, e.g., *Moore v. Kemp, supra* note 23; *State v. Scott*, 33 S.W.3d 746 (Tenn. 2000); 3 Nancy Hollander et al., Wharton's Criminal Procedure § 16:2 (14th ed. 2017).

[35] See, e.g., *Sommers v. Com., supra* note 32; 3 LaFave et al., *supra* note 28.

[36] See 3 LaFave et al., *supra* note 28. See, also, e.g., *Scott v. State of La., supra* note 23; *McLeod v. State*, 581 So. 2d 1144 (Ala. Crim. App. 1990); *Schultz v. State*, 497 N.E.2d 531 (Ind. 1986); *State v. Balfa*, 506 So. 2d 1369 (La. App. 1987); *Johnson v. State*, 529 So. 2d 577 (Miss. 1988).

[14,15] Here, the district court reasoned defense counsel had failed to demonstrate the DNA evidence could not be strongly contested through rigorous cross-examination without the assistance of an appointed expert. Sometimes, under the facts presented, pretrial access to the State's experts and their cross-examination at trial will be adequate to contest the issue.[37] In *State v. Turco*,[38] the Nebraska Court of Appeals explained public money need not provide defense counsel with equipment for a "'fishing expedition.'" Rather, there must be some showing by defense counsel that the expert is necessary for an adequate defense, and the district court did not abuse its discretion in denying a motion to appoint an expert when the defendant failed to show why a vigorous cross-examination of the State's witnesses would not achieve the same result.[39]

[16] Wood argues he was caught in a Catch-22 whereby he had to employ an expert he could not afford in order to demonstrate the need for the appointment of an expert. This is a concern discussed by several courts and legal authorities.[40] We find that a Catch-22 is only created when the burden of the preliminary showing of necessity is unreasonably high.[41] The

---

[37] See 3 LaFave et al., *supra* note 28.

[38] *State v. Turco, supra* note 22, 6 Neb. App. at 731, 576 N.W.2d at 852, quoting *United States v. Schultz*, 431 F.2d 907 (8th Cir. 1970).

[39] See *State v. Turco, supra* note 22.

[40] See, e.g., *F.T.C. v. Atlantex Associates*, 872 F.2d 966 (11th Cir. 1989); *Yarbrough v. Johnson*, 490 F. Supp. 2d 694 (E.D. Va. 2007); *U.S. v. Warner*, 62 M.J. 114 (C.A.A.F. 2005); Emily J. Groendyke, Ake v. Oklahoma: *Proposals for Making the Right a Reality*, 10 N.Y.U. J. Legis. & Pub. Policy 367 (2007); Fred Warren Bennett, *Toward Eliminating Bargain Basement Justice: Providing Indigent Defendants With Expert Services and an Adequate Defense*, 58 Law & Contemp. Probs. 95 (Winter 1995); A. Michelle Willis, Comment, *Nonpsychiatric Expert Assistance and the Requisite Showing of Need: A Catch-22 in the Post-*Ake *Criminal Justice System*, 37 Emory L.J. 995 (1988).

[41] See Paul C. Giannelli, Ake v. Oklahoma: *The Right to Expert Assistance in a Post-*Daubert, *Post-DNA World*, 89 Cornell L. Rev. 1305 (2004).

defense cannot be asked to support the motion for appointment of an expert with information that can only be found by paying for expert assistance the defendant cannot afford. Neither should the trial court demand defense counsel conduct a lay investigation outside the bounds of what can be expected from an attorney of ordinary training and experience.[42] But the district court did not impose an unreasonably high standard in finding Wood's request inadequate.

[17] The defendant does not have a right to the appointment of an expert every time the material incriminating evidence adduced by the State involves specialized knowledge. There must be some particularized preliminary showing either that cross-examination of the State's experts was inadequate to the task of revealing misleading or inadequate information or that there was a reasonable necessity for an independent expert to help the defense prepare for effective cross-examination of the State's experts.[43]

Defense counsel asserted in support of Wood's motion for appointment of an expert that the need for an expert was "apparent" because counsel lacked expertise in DNA testing; that the jury needed to understand the significance of minor contributors in a mixture of touch DNA and how touch DNA "exists in life"; and, without any supporting affidavit or testimony, that there was a phone call giving the defense reason to question the State's experts and proof. The district court did not require Wood to support his motion with expert testimony or assertions as to what an appointed expert would say,[44] but found counsel's unsupported arguments to be insufficient. We cannot say this was an abuse of discretion.

### (b) Ineffective Assistance

[18] Wood alternatively asserts defense counsel was ineffective in failing to provide adequate support for the motion

---

[42] See, e.g., *Cade v. State, supra* note 32.

[43] See *id.*

[44] See, e.g., *Williams v. Martin*, 618 F.2d 1021 (4th Cir. 1980).

for appointment of a DNA expert. On direct appeal when the defendant has obtained new counsel, the resolution of ineffective assistance of trial counsel claims turns upon the sufficiency of the record to affirmatively prove or rebut the merits of the ineffective assistance claims.[45] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[46] The determining factor is whether the record is sufficient to adequately review the question.[47]

[19] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[48] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[49] An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order.[50]

[20,21] An appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance.[51] Thus, in order to preserve a claim of ineffective assistance of trial counsel when new counsel represents the defendant on direct appeal, the appellant must make specific allegations of the conduct the appellant claims constituted deficient performance by trial counsel.[52]

[22] In contrast, appellate counsel does not waive a claim of ineffective assistance of trial counsel by failing to

---

[45] See *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[46] *Id.*

[47] *Id.*

[48] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[49] *State v. Filholm, supra* note 45.

[50] *Id.*

[51] *Id.*

[52] See *id.*

specifically allege and argue prejudice, because doing so would often require details unlikely to be found in the record or known to the defendant without further inquiry.[53] It is, nevertheless, advisable for appellate counsel to specifically argue prejudice if counsel believes the details in the trial record pertinent to the prejudice prong of the ineffective assistance inquiry are sufficient to adequately review the question. Appellate courts are free to determine on direct appeal the effectiveness of trial counsel on the prejudice prong if the record affirmatively proves or rebuts the claim on that ground.[54]

We conclude that Wood has adequately assigned and argued the issue of his trial counsel's deficient conduct with respect to the motion for appointment of an expert, but neither the question of deficiency nor of prejudice can affirmatively be proved or rebutted by the trial record. We have already determined defense counsel's motion and support thereof was inadequate to compel, under procedural due process, the appointment of a DNA expert. However, defense counsel would only have been constitutionally ineffective in this regard if adequate support actually existed.

Wood argues defense counsel could have at least proffered an affidavit by Wood's appointed expert sexual assault nurse examiner. We agree with the State this was unlikely to have made a difference, because her opinions about the need for a DNA expert would fall outside the range of her expertise. But Wood does not limit his allegations to trial counsel's failure to proffer the sexual assault nurse examiner's affidavit. For instance, he additionally refers to the possibility, reflected in the discussion at the hearing on the motion, that someone at the Nebraska State Patrol Crime Laboratory had said no male DNA was detected on any of the swabs.

---

[53] See *id.*

[54] See, e.g., *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013); *State v. Hubbard*, 267 Neb. 316, 673 N.W.2d 567 (2004); *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995).

The trial record does not affirmatively prove or rebut whether there were such grounds to dispute the biologist's testimony that male DNA was found or whether there were additional reasons why the opportunity to cross-examine the State's experts, without independent expert advice in preparation, was inadequate to contest the incriminating DNA evidence. Though the incriminating evidence against Wood was not limited to the DNA evidence, the DNA evidence, including the presence of male DNA on the external vaginal swabs, was not insignificant, and we cannot speculate as to what extent an appointed expert would have been pivotal in contesting it.

The record does not affirmatively prove or refute whether it is reasonably probable that effective trial counsel could have adequately supported the motion or that the appointment of a DNA expert would have led to a challenge to prejudicial DNA evidence which could have changed the result of trial.[55] As such, we do not resolve on direct appeal Wood's claim that trial counsel was ineffective in failing to adequately support his motion for appointment of a DNA expert.

### 2. Refusal to Allow Impeachment of Price's Character as Convicted Felon

[23] Turning back to Wood's alleged trial errors, we observe in relation to Wood's assertion that the trial court erred in denying his attempt to adduce that Price was a convicted felon in order to impeach Price's out-of-court statements, Wood fails to specify the out-of-court statements he believes to be at issue. We ordinarily do not scour the record in search of facts that might support an appellant's claim.[56] But having read the entirety of the testimony of the victim's mother, we find that there are few potential out-of-court statements which could be subject to this claim and that the trial court did not abuse

---

[55] See, e.g., *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018).

[56] See *State v. Dill*, 300 Neb. 344, 913 N.W.2d 470 (2018).

its discretion in sustaining the State's relevancy objection to Price's status as a convicted felon.

[24-27] Neb. Rev. Stat. § 27-806 (Reissue 2016) allows the credibility of a declarant of a hearsay statement or statement defined in Neb. Rev. Stat. § 27-801(4)(b)(iii), (iv), or (v) (Cum. Supp. 2020)—statements offered against a party that are by a person authorized by the party, by the party's agent or servant, or by the party's coconspirator—to be attacked by any evidence that would be admissible for those purposes if the declarant had testified as a witness, without any opportunity to deny or explain. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.[57] Statements offered to show their effect on the listener are not hearsay.[58] Also, statements are not hearsay to the extent they are offered for context and coherence of other admissible statements and not for the truth or the truth of the matter asserted.[59] It does not appear that any of Price's out-of-court statements were hearsay.

[28,29] Moreover, Price's out-of-court statements do not concern matters that were in dispute at trial. The basic premise underlying impeachment of a witness by evidence of a prior felony conviction is that any past felony committed by the witness is to some degree relevant to that individual's credibility.[60] But credibility of a witness is not at issue when the truth of the assertions is not in dispute.[61]

---

[57] *State v. Hassan*, 309 Neb. 644, 962 N.W.2d 210 (2021). See, also, § 27-801(3).

[58] See 2 McCormick on Evidence § 249 (Robert P. Mosteller ed., 8th ed. 2020).

[59] See, *U.S. v. Ralston*, 973 F.3d 896 (8th Cir. 2020); *U.S. v. Spencer*, 592 F.3d 866 (8th Cir. 2010); *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021).

[60] See, e.g., *State v. Bush*, 131 Idaho 22, 951 P.2d 1249 (1997); *People v. Garth*, 93 Mich. App. 308, 287 N.W.2d 216 (1979).

[61] See *State v. Veiman*, 249 Neb. 875, 546 N.W.2d 785 (1996).

[30] The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding relevancy will not be reversed absent an abuse of discretion.[62] The trial court did not abuse its discretion in concluding that Price's credibility was not relevant to Price's out-of-court statements adduced during the mother's testimony.

### 3. Prohibiting Wood From Further Refreshing Victim's Recollection With Video and Effectiveness of Cross-Examination of Victim and Forensic Interviewer

We also do not agree with Wood's assertion that he was deprived of the right to confrontation by the court's decision prohibiting him on the second day of cross-examination of the victim from further use of the interview video to refresh her recollection or to impeach her testimony. First, it is unclear that defense counsel objected below to the trial court's ruling at all, and defense counsel certainly did not raise the right to confrontation. Therefore, the alleged error was waived.[63]

[31] But, for the sake of completeness, we also observe that the record does not support the alleged error. Under Neb. Rev. Stat. § 27-611(1) (Reissue 2016), the trial judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth, avoid needless consumption of time, and protect witnesses from harassment or undue embarrassment. The Confrontation Clause guarantees an opportunity for effective cross-examination, but not in whatever way or to whatever extent the defendant might wish, and trial judges retain wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment,

---

[62] *Sacco v. Carothers*, 257 Neb. 672, 601 N.W.2d 493 (1999).

[63] See *State v. Nadeem*, 284 Neb. 513, 822 N.W.2d 372 (2012).

prejudice, confusion of the issues, the witness' safety, or inter-rogation that is repetitive or only marginally relevant.[64]

In making its ruling, the trial court agreed with the pros-ecution that if the defense was trying to refresh the victim's recollection in an attempt to impeach her testimony at trial, defense counsel could do so through other means, such as through the testimony of the forensic interviewer. It cited to *State v. Molina*,[65] in which we held that the court did not abuse its discretion in refusing to play for the jury a video recording of a witness as extrinsic evidence of an inconsistent statement, because its probative value was outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We see nothing amiss in the trial court's ruling, and we find no merit to Wood's arguments that seek to avoid the applicable standards pertaining to the trial court's discretion by framing the error as an act of the guardian ad litem who stopped the victim from watching the video in its entirety, as had been ordered. The court was free to order that the victim watch the remainder of the video, if it had continued to believe that was a reasonable approach. The court did not err in determining it was not.

Wood alternatively argues trial counsel was ineffective by apparently abandoning further attempts to refresh the victim's recollection after the court's ruling and by having impeached the victim's every inconsistent statement in an allegedly clumsy manner that Wood argues bolstered the forensic interviewer's testimony that child victims of sexual assault do not always disclose all the details of an assault in a linear fashion. We find these contentions of ineffective assistance of counsel are affirmatively refuted by the trial record.

---

[64] See *State v. Schreiner*, 276 Neb. 393, 745 N.W.2d 742 (2008). See, also, *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).

[65] *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

[32,33] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[66] In assessing deficiency in counsel's performance, a court presumes that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[67]

[34-36] Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance.[68] Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim.[69] We do not use perfect hindsight to criticize unsuccessful trial strategies[70] or second-guess trial strategy.[71]

We caution that it is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal. However, given defense counsel's cross-examination of the victim and arguments in closing, the record here is sufficient to demonstrate it was defense counsel's strategy to undermine the victim's credibility by pointing out her inconsistent statements in describing the details of the assault.

This was not unreasonable. The assertion that this strategy may have inherently served to bolster the forensic interviewer's testimony about the way children disclose sexual assault—which was adduced to reduce any inference that such inconsistencies impeached the witness' credibility in the first place—does not render defense counsel's cross-examination

---

[66] *State v. Assad*, 304 Neb. 979, 938 N.W.2d 297 (2020).

[67] *Strickland v. Washington, supra* note 48, 466 U.S. at 690.

[68] *McKinney v. State*, 281 Ga. 92, 635 S.E.2d 153 (2006).

[69] *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003).

[70] *Id*.

[71] *Calkins v. U.S.*, 795 F.3d 896 (8th Cir. 2015).

deficient. Nor was defense counsel constitutionally deficient in the manner in which the victim's inconsistent statements were adduced or by not adducing more inconsistent statements.

We find similarly with respect to Wood's claim that defense counsel was deficient in cross-examining the forensic interviewer. The entirety of Wood's argument with respect to cross-examination of the forensic interviewer borders on conclusory. Wood asserts that adducing the victim's statements that Wood put his private part in her private part in the bedroom and took off his clothes "accomplished nothing for Wood" and "bolstered" the victim's testimony.[72] The record reflects that Wood adduced numerous inconsistent statements and was attempting to effectuate that strategy during his cross-examination of the forensic interviewer. The simple assertion that defense counsel could have performed better is not grounds to conclude defense counsel was constitutionally deficient.

The record affirmatively refutes Wood's claims regarding ineffective assistance of trial counsel in cross-examining the victim and the forensic interviewer.

### 4. INEFFECTIVE ASSISTANCE IN FAILING TO OBJECT TO INCONCLUSIVE DNA TESTING RESULTS, OFFERING EXHIBIT 20, AND FAILING TO OBJECT TO TESTIMONY DESCRIBING TESTING DONE BY ANOTHER FORENSIC BIOLOGIST WHO DID NOT TESTIFY AT TRIAL

Wood makes several claims of ineffective assistance relating to the DNA evidence. We will address each in turn.

First, Wood assigns and argues that counsel was ineffective for failing to object to the biologist's testimony that male DNA was present on the external vaginal swabs and that she could not say with certainty that no male DNA was on the vaginal or oral swabs. Wood also argues counsel was ineffective in failing to object to exhibit 18, which shows there was an insufficient quantity of DNA present on the external vaginal swabs

---

[72] Brief for appellant at 36.

to obtain any profile to attempt to match with Wood's profile or anyone else's. Wood did not assign as error that defense counsel was ineffective in failing to object to exhibit 18, and thus, we will not consider that argument.[73] Exhibit 18 is not cumulative to the biologist's testimony stating male DNA was found. Wood argues the biologist's testimony was inadmissible due to its potential to mislead the jurors because the testing of that male DNA did not lead to conclusive results. For the foregoing reasons, we find no merit to this argument.

[37,38] An expert does not have to couch his or her opinion in the magic words of "reasonable certainty," but it must be sufficiently definite and relevant to provide a basis for the fact finder's determination of a material fact.[74] A court should exclude an expert's opinion when it gives rise to conflicting inferences of equal probability, so the choice between them is a matter of conjecture.[75]

Wood relies on *State v. Johnson*[76] to support his argument that the biologist's testimony that male DNA was detected on the external vaginal swabs was insufficiently definite and relevant. We held in *Johnson* that the trial court had improperly admitted, over defense counsel's objections, irrelevant DNA testing results, though ultimately the evidentiary error was harmless. At issue was expert testimony that the defendant's DNA profile could be neither included nor excluded from a mixed DNA sample from one of the victim's fingernails. The expert testified the results were inconclusive because there was only a partial minor profile obtained from the samples; however, the expert revealed that some of the defendant's alleles matched those found in the partial minor profile of one of the samples. The expert could not determine the sex of

---

[73] See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

[74] *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015).

[75] *Id.*

[76] *Id.* See, also, *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011).

the minor contributor. The expert also testified that there *may* have been a minor contributor's DNA on one of the finger-nails and that she could not draw any conclusions about the partial minor profile she found on a sample of the rope used in the crime.[77]

[39,40] We held in *Johnson*:

> Presenting this evidence without offering any statistical relevance of the matching alleles she found, or the prob-ability that the minor profile would exclude a random per-son, suggested to the jury that [the defendant] was linked to the evidence and that the proof would be even stronger if investigators had found more DNA.[78]

We explained that the potential precision of DNA testing is well known; thus, jurors might wrongly assume, absent evi-dence of statistical relevance, that any DNA profile match is extremely unlikely and therefore extremely probative.[79] We held that because of the significance that jurors will likely attach to DNA evidence, the value of inconclusive testing results without statistical relevance is substantially outweighed by the danger that the evidence will mislead the jurors.[80]

Here, the biologist's testimony that male DNA was present on the external vaginal swabs taken during the physical exami-nation of the victim is not analogous to the evidence found in *Johnson* to be lacking in probative value. The biologist conclu-sively testified that male DNA was present. We disagree with Wood's supposition that conclusive evidence of the presence of male DNA was nevertheless insufficiently certain and was mis-leading because further DNA testing could not obtain a DNA profile from it.

[41] In an alleged sexual assault described by a female vic-tim as involving her genital area and a male perpetrator, the

---

[77] *State v. Johnson, supra* note 74.

[78] *State v. Johnson, supra* note 74, 290 Neb. at 882, 862 N.W.2d at 773.

[79] *State v. Johnson, supra* note 74.

[80] See *id.*

presence of male DNA near the victim's genital area is relevant to whether the assault occurred as the victim described, and such evidence is not outweighed by a danger of confusing the issues or misleading the jurors even if the DNA is of insufficient quantity or quality to obtain a profile.[81] Here, the presence of male DNA on the external vaginal swabs of the victim's external vaginal area made the truth of the victim's allegations more probable, even if the DNA did not identify Wood specifically. Because the testimony concerning the presence of male DNA on the external vaginal swabs was admissible, defense counsel was not deficient at trial for failing to object to it.

We also find the biologist's testimony acknowledging the hypothetical possibility of the presence of male DNA that she was unable to detect on other swabs distinguishable from the testimony in *Johnson* that there *may* have been a minor contributor.[82] The biologist simply acknowledged she could not "say definitively, no, there's no DNA present. It just wasn't in great enough amounts to be detected using this form of testing." Such testimony did not call for speculation but merely affirmed that simply because something microscopic cannot be detected by the current scientific methods available that does not mean it does not exist.

The record affirmatively refutes Wood's claim that counsel was ineffective in failing to object to the biologist's testimony that he alleges was insufficiently certain and definite.

Wood also assigns and argues with respect to the DNA evidence that defense counsel was ineffective by introducing exhibit 20, the report of the Y-STR DNA testing showing that no Y-STR DNA profile was found from the male DNA, and by failing to object to the biologist's testimony about those test results, on the grounds of confrontation, because they were not

---

[81] See *Rodriguez v. State*, 158 N.E.3d 802 (Ind. App. 2020). See, also, *In re Brandon P.*, 2013 IL App (4th) 111022, 992 N.E.2d 651, 372 Ill. Dec. 809 (2013). But see *State v. Gutierrez*, 391 Wis. 2d 799, 943 N.W.2d 870 (2020).

[82] See *State v. Johnson, supra* note 74.

conducted by her. We find the record affirmatively refutes this claim of ineffective assistance of counsel.

In light of the admissibility of the presence of male DNA on the external vaginal swabs, it is reasonably apparent from the record that defense counsel's strategy in introducing exhibit 20 and in not objecting to the biologist's testimony pertaining to exhibit 20 was to minimize the prejudice of the biologist's prior testimony that male DNA was found. By introducing exhibit 20 and not objecting to the biologist's testimony about the testing reflected therein, defense counsel demonstrated that even the most sophisticated testing was unable to detect a profile from that male DNA, which, notably, was not from semen. This would have been consistent with minimal amounts of DNA and allowed defense counsel to argue the jury should infer that the male DNA found was the result of indirect transfer during the victim's prolonged presence in Wood's home. In light of the presumption that defense counsel made all significant decisions in the exercise of reasonable professional judgment, we cannot find that the defense counsel's decision was unreasonable.

### 5. Failure to Investigate Case Fully

[42,43] Wood's argument that his trial counsel was ineffective in "Failing to Investigate the Case Fully" is insufficiently specific. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[83] As stated, when the claim is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.[84] Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and

---

[83] *State v. Figures, supra* note 2.

[84] *Id.*

an appellate court will not scour the remainder of the brief in search of such specificity.[85]

We held, in *State v. Mrza*,[86] that an assignment of error that trial counsel was ineffective by "'fail[ing] to adequately investigate [the defendant's] defenses'" lacked the specificity we demand on direct appeal. Wood's assignment of error is similar. It lacks any specificity as to what component of investigation his counsel was allegedly deficient in failing to conduct. Therefore, we do not address it.

### 6. Failure to Request
### Lesser-Included Instruction

[44,45] Lastly, we consider Wood's argument that his trial counsel was ineffective by failing to request an instruction on the lesser-included offense of attempted first degree sexual assault of a child. A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense.[87] The Nebraska Supreme Court has previously held that attempted first degree sexual assault of a child is a lesser-included offense of first degree sexual assault of a child.[88]

The defense's expert nurse practitioner testified there were no injuries indicative of sexual abuse; therefore, according to Wood, there was a rational basis for acquitting him of the greater offense and convicting him of the lesser offense. Under § 28-319.01, as relevant here, a person commits sexual assault of a child in the first degree when he or she subjects

---

[85] *State v. Mrza, supra* note 73.

[86] See *id.* at 935, 926 N.W.2d at 86.

[87] *State v. Sinica*, 277 Neb. 629, 764 N.W.2d 111 (2009).

[88] See *State v. James*, 265 Neb. 243, 655 N.W.2d 891 (2003).

another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older. Under Neb. Rev. Stat. § 28-201 (Reissue 2016), a person shall be guilty of an attempt to commit a crime if that person intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he or she believes them to be or that person intentionally engages in conduct which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime. When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he or she intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.[89] Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.[90]

There was conflicting evidence whether there were sequelae of a sexual assault by penetration found during the physical examination of the victim. The touch DNA was on the victim's underwear, and the male DNA detected was outside of the vaginal opening. But it is apparent from the trial record that counsel's strategy was to argue that nothing inappropriate occurred during the sleepover. It is a valid strategy to obtain a full acquittal through an "'all or nothing' defense."[91] We will not second-guess that strategy. The record affirmatively rebuts Wood's claim that defense counsel was deficient by failing to request an instruction on the lesser-included offense of attempt.

---

[89] § 28-201.

[90] *Id.*

[91] *Williams v. State*, 353 Ga. App. 821, 830, 840 S.E.2d 32, 39 (2020). See *Druery v. Thaler*, 647 F.3d 535 (5th Cir. 2011).

## VI. CONCLUSION

For the foregoing reasons, we find no merit to Wood's claims of trial error. We likewise find no merit to Wood's claims of ineffective assistance of counsel, with the exception that we do not reach the merits of his argument that counsel was ineffective in failing to adequately support his motion for a DNA expert.

Affirmed.