IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. FRANKLIN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

DEVRON D. FRANKLIN, APPELLANT.


Filed August 16, 2022.    Nos. A-21-605, A-21-607.


Appeals from the District Court for Douglas County: MARLON A. POLK, Judge. Affirmed in part, and in part vacated and remanded for resentencing.

Thomas C. Riley, Douglas County Public Defender, and Leslie E. Cavanaugh, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.


PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a consolidated jury trial in case No. A-21-605 and case No. A-21-607, Devron D. Franklin was convicted of eight felonies. The Douglas County District Court subsequently found Franklin to be a habitual criminal in both cases and sentenced him to various concurrent and consecutive terms of imprisonment. On appeal, Franklin claims violations of his statutory right to a speedy trial and errors regarding jury selection and the admission of certain exhibits at trial. We affirm Franklin's convictions. However, we have noted issues of plain error in Franklin's sentences, and we therefore vacate all sentences and remand both cases for resentencing.

- 1 -

## II. BACKGROUND

On July 22, 2018, Tyler Effle was robbed at gunpoint outside of his residence in Omaha, Nebraska. On July 27, Anastasia Ruhland was robbed at gunpoint outside of her residence in Omaha. Later, on July 27, someone attempted to rob Justin Cramer outside of his residence in Omaha; during the attempted robbery Cramer was shot three times. During the investigations of the three incidents, Franklin was developed as a suspect. On July 28, law enforcement attempted a traffic stop of Franklin, but Franklin fled in his vehicle. After giving chase, law enforcement was eventually able to apprehend Franklin.

In case No. A-21-605 (CR 18-3610), the State filed an information on October 11, 2018, charging Franklin with four counts: count 1, first degree assault, a Class II felony, in violation of Neb. Rev. Stat. § 28-308(1) (Reissue 2016); count 2, use of a deadly weapon (firearm) to commit a felony, a Class IC felony, in violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 2016); count 3, attempted robbery, a Class IIA felony, in violation of Neb. Rev. Stat. §§ 28-324 and 28-201(4)(b) (Reissue 2016); and count 4, use of a deadly weapon (firearm) to commit a felony, a Class IC felony, in violation of § 28-1205(1). Cramer was the named victim in counts 1 and 3. The Douglas County Public Defender's office was appointed to represent Franklin.

In case No. A-21-607 (CR 18-3497), the State filed an information on October 3, 2018, charging Franklin with five counts: count 1, robbery, a Class II felony, in violation of § 28-324; count 2, use of a deadly weapon (firearm) to commit a felony, a Class IC felony, in violation of § 28-1205(1); count 3, robbery, a Class II felony, in violation of § 28-324; count 4, use of a deadly weapon (firearm) to commit a felony, a Class IC felony, in violation of § 28-1205(1); and count 5, possession of a deadly weapon (firearm) by a prohibited person, second offense, a Class IB felony, in violation of Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2018). Effle was the named victim in count 1, and Ruhland was the named victim in count 3. The Douglas County Public Defender's office was appointed to represent Franklin. With leave granted by the district court, the State filed an amended information on September 25, 2019, adding count 6, "Operating Motor Vehicle to Avoid Arrest Willful Reckless Driving," a Class IV felony in violation of Neb. Rev. Stat. § 28-905 (Reissue 2016), and count 7, "Habitual Criminal" as described in Neb. Rev. Stat. § 29-2221 (Reissue 2016).

The record reflects that beginning on November 19, 2018, Franklin made several consecutive motions to continue the pretrial conference in both cases. And despite having counsel, Franklin filed pro se motions to dismiss in both cases on May 10 and June 10, 2019, alleging violations of his statutory and constitutional rights to a speedy trial. On June 17, the district court entered an order "setting a Pretrial in the . . . case[s] on [Franklin's] motion[s] to dismiss for violation of [his] Right to Speedy Trial"; the hearing was set for June 20. However, the pretrial conference was then continued multiple times thereafter. We note here that there are a number of motions and hearings that took place in 2019 and 2020, however, orders related to the same were not entered until 2021. That said, other than the speedy trial issue which we will discuss in our analysis, the procedural nature of the underlying proceedings and the delayed filing of court orders do not impact the issues raised on appeal.

Franklin again filed pro se motions to dismiss in both cases on January 11, 2021, alleging violations of his statutory and constitutional rights to a speedy trial.

On March 26, 2021, the district court filed a number of orders, many of which stemmed from pleadings and hearings dating back to 2019. One order granted the State's September 2019 motion to amend the information in case No. A-21-607 (CR 18-3497) to add a sixth count for operating a motor vehicle to avoid arrest and "COUNT 7: HABITUAL CRIMINAL." Another order granted the State's 2019 motions to consolidate case No. A-21-605 (CR 18-3610) and case No. A-21-607 (CR 18-3497) for trial. In both orders, the court referenced these matters being heard in September 2019, and that the motions were sustained for "reasons stated in open court on the record." (The bill of exceptions does not contain the referenced September 2019 hearing.) None of the March 26, 2021, orders addressed Franklin's speedy trial claims.

On April 7, 2021, the district court entered a "Jury Trial Order" stating that trial was scheduled for April 19.

Not enough jurors were called for April 19, 2021, so voir dire commenced on April 21. Voir dire was conducted with 43 potential jurors--3 were excused by the district court itself without objection. After the parties exercised their peremptory strikes, Franklin raised a challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), because the State struck two of the three "African-American" jurors, and Franklin claimed that one of those struck jurors had pointed out the lack of diversity in the venire which that juror did not think was fair to the defendant. The district court denied Franklin's *Batson* challenge. Trial proceeded on the merits of the case, and the parties stipulated that Franklin was a "prohibited person" as defined by statute because he had previously been convicted of a felony. Other facts will be discussed as necessary in the analysis.

On April 28, 2021, the jury found Franklin guilty of 8 of the 10 charges. The jury found Franklin guilty of: robbery of Ruhland; use of a deadly weapon (firearm) to commit a felony; possession of a deadly weapon (firearm) by a prohibited person; "Operating Motor Vehicle to Avoid Arrest Willful Reckless Driving"; first degree assault of Cramer; use of a deadly weapon (firearm) to commit a felony; attempted robbery of Cramer; and use of a deadly weapon (firearm) to commit a felony. The jury found Franklin not guilty of robbery of Effle and use of a deadly weapon (firearm) to commit a felony (counts 1 and 2 in CR 18-3497). The district court entered judgment on the convictions.

Following a sentencing hearing on June 21 and 23, 2021, the district court entered separate orders. In its order filed on June 29, in case No. A-21-605 (CR 18-3610), the court found that Franklin was a habitual criminal and sentenced him to 10 years to 10 years and 1 day imprisonment on each of the four counts: first degree assault of Cramer, attempted robbery of Cramer, and two counts use of a deadly weapon (firearm) to commit a felony. The court stated,

> Sentence in Counts I, II shall run concurrent with Counts I, II and III in [case No. A-21-607]; and the sentence in Counts III and IV shall run consecutive to each other and consecutive to Counts I and II; the sentences in Count III and IV in this case shall run consecutive to the sentences in [case No. A-21-607]. . . . Credit for time served for 1061 days shall be given against sentence imposed.

In its order filed on July 8, 2021, in case No. A-21-607 (CR 18-3497), the district court found Franklin was a habitual criminal and sentenced him to 10 years to 10 years and 1 day imprisonment on each of the following counts: count 3, robbery of Ruhland; count 4, use of a

deadly weapon (firearm) to commit a felony; and count 6, operating a vehicle to avoid arrest. The court sentenced Franklin to 20 years to 20 years and 1 day imprisonment on count 5, possession of a deadly weapon (firearm) by a prohibited person. The court stated, "Sentence in Counts III, VI and V shall run concurrent to each other; the sentence in Count VI shall run consecutive to Counts III, IV and V. . . . Credit for time served for 1061 days shall be given against sentence imposed."

Franklin appeals.

## III. ASSIGNMENTS OF ERROR

Franklin assigns, reordered, that (1) he was denied his right to a speedy trial, (2) the district court erred in overruling his *Batson* challenge to the racial makeup of the jury, and (3) the district court erred in admitting three 911 recordings into evidence.

## IV. STANDARD OF REVIEW

An appellate court reviews de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. It reviews for clear error a trial court's factual determination regarding whether a prosecutor's race-neutral explanation is persuasive and whether the prosecutor's use of a peremptory challenge was purposefully discriminatory. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id*.

## V. ANALYSIS

### 1. SPEEDY TRIAL

Franklin filed pro se motions to dismiss in both cases on May 10 and June 10, 2019, and again on January 11, 2021, alleging violations of his statutory and constitutional rights to a speedy trial. The district court did not enter any written rulings or orders regarding Franklin's motions to dismiss. Trial commenced on April 21, 2021. Franklin was found guilty and convicted of eight felony counts on April 28. The court filed its sentencing orders on June 29 in case No. A-21-605, and on July 8 in case No. A-21-607. Franklin filed his notices of appeal on July 22.

On appeal, Franklin has the same counsel he had at trial and argues only that his statutory right to a speedy trial was violated; he makes no mention of his constitutional right to a speedy trial. We likewise limit our analysis to Franklin's statutory speedy trial claim.

The denial of a motion for discharge on statutory speedy trial grounds is an order that affects a substantial right in a special proceeding and is immediately appealable; however, a pretrial order denying a motion for absolute discharge on constitutional speedy trial grounds does not affect a substantial right during a special proceeding and is not an immediately appealable final order. See *State v. Abernathy*, 310 Neb. 880, 969 N.W.2d 871 (2022). A notice of appeal shall be filed within 30 days of entry of judgment, decree, or final order. See Neb. Rev. Stat. § 25-1912 (Cum. Supp. 2020).

- 4 -

Notably, as previously mentioned, the district court never entered a written order in response to Franklin's motions to dismiss for alleged violations of his right to a speedy trial. Instead, the case proceeded to trial. As a result, Franklin's motions were inferentially denied when the court proceeded to trial, thus triggering his 30 days to file an appeal upon the commencement of trial. Where a motion to discharge on speedy trial grounds is submitted to a trial court, that motion is inferentially denied where the trial court proceeds to trial without expressly ruling on the motion. *State v. Ward*, 257 Neb. 377, 597 N.W.2d 614 (1999), *disapproved on other grounds, State v. Feldhacker*, 267 Neb. 145, 672 N.W.2d 627 (2004). "At that point, the denial of the defendant's motion is a final, appealable order, and the defendant must secure his or her rights to appellate review by filing a timely notice of appeal." *State v. Ward*, 257 Neb. at 384, 597 N.W.2d at 619. See, also, *State v. Tyma*, 264 Neb. 712, 651 N.W.2d 582 (2002) (district court did not rule on motion to dismiss on statutory speedy trial grounds until after conclusion of trial; motion was "inferentially denied" on date trial commenced, making post-trial appeal untimely). It warrants pointing out that such an "inferential" order is a unique exception to our general jurisprudence which requires a written order, with a dated file-stamp, to constitute a final, appealable order. See *State v. Melton*, 308 Neb. 159, 953 N.W.2d 246 (2021) (entry of judgment occurs when clerk of court places file stamp and date upon judgment; criminal judgment is not final for purposes of appeal until file-stamped sentencing order is entered by clerk).

In the instant case, the district court inferentially denied Franklin's motions to dismiss on statutory speedy trial grounds when trial commenced on April 21, 2021. At that point, the denial of Franklin's motions were final, appealable orders, at least as to his claim based on statutory speedy trial grounds, and he had 30 days to file his notice of appeal. However, he did not file his notice of appeal until July 22. Because Franklin did not timely appeal the denial of his motions to dismiss on statutory speedy trial grounds, we lack jurisdiction over that matter.

2. *BATSON* CHALLENGE

Franklin argues that the district court erred by overruling his *Batson* challenge to the racial makeup of the jury. He contends the State struck two out of the three prospective Black jurors, and that those two jurors, No. 11 and No. 18, were not struck for a racially neutral reason.

(a) Applicable Law

A prosecutor is ordinarily entitled to exercise permitted peremptory challenges for any reason at all, if that reason is related to his or her view concerning the outcome of the case. *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). However, the U.S. Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), held that the Equal Protection Clause forbids the prosecutor from challenging jurors solely because of their race. *State v. Wofford, supra*. When a timely objection under *Batson* is made, a trial court must inquire into the reasons behind the peremptory strike. *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017).

Determining whether a prosecutor impermissibly struck a prospective juror based on race is a three-step process. *State v. State v. Briggs, supra*. See, also, *Batson v. Kentucky, supra*. In this three-step process, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *State v. Briggs, supra*. First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of race. *Id*. A

- 5 -

defendant satisfies the requirements of the first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. *State v. Lester, supra*. See, also, *Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005) (defendant satisfies requirements of *Batson's* first step by producing evidence sufficient to permit trial judge to draw inference discrimination occurred). Second, assuming the defendant made such a showing, the prosecutor must offer a race-neutral basis for striking the juror. *State v. Briggs, supra.* And third, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Id.*

Once the trial court has decided the ultimate question of intentional discrimination, however, the questions on appeal are only whether the prosecutor's reasons were facially race neutral and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous. *Id.* Whether a prosecutor's reasons for using peremptory challenges are race neutral is a question of law. *Id.* A trial court's determination that the prosecutor's race-neutral explanation should be believed, on the other hand, frequently involves evaluation of a prosecutor's credibility, which requires deference to the court's findings absent exceptional circumstances. *Id.*

In determining whether a prosecutor's explanation for using a peremptory challenge is race neutral, a court is not required to reject an explanation because it is not persuasive, or even plausible; it is sufficient if the reason is not inherently discriminatory. *Id.* Only inherently discriminatory explanations are facially invalid. *State v. Wofford, supra*.

In determining whether a defendant has established purposeful discrimination in the use of a peremptory challenge, a trial court may consider whether the prosecutor's criterion has a disproportionate impact on a particular race. *State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). If so, the court may consider whether such evidence shows the prosecutor's proffered explanation was pretextual. *Id*. The relative number or percentage of African–American jurors peremptorily struck can be considered when evaluating whether a prosecutor's stated reasons for a strike were pretextual. See *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012). The Nebraska Supreme Court has recognized some factors that can be considered in evaluating the third step of the *Batson* analysis: (1) whether members of the relevant racial or ethnic group served unchallenged on the jury and whether the striking party struck as many of the relevant racial or ethnic group from the venire as it could, (2) whether there is a substantial disparity between the percentage of a particular race or ethnicity struck and the percentage of its representation in the venire, and (3) whether there was a substantial disparity between the percentage of its representation on the jury. *State v. Nave, supra*. See, also, *State v. Thorpe, supra* (these factors are relevant in determining whether there is a sufficient pattern of peremptory strikes to support an inference of discrimination).

Evidence that a prosecutor's reasons for striking a Black prospective juror apply equally to an otherwise similar non-Black prospective juror, who is allowed to serve, tends to suggest purposeful discrimination. *Foster v. Chatman*, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016).

(b) Voir Dire and Franklin's *Batson* Challenge

In the case before us, voir dire was conducted starting with a panel of 40 potential jurors. The district court itself questioned the potential jurors, and during its questioning, excused three jurors without objection; each of those jurors was replaced with another potential juror.

Accordingly, there were still 40 potential jurors after the court completed its questioning. The court's final question to the prospective jurors was, "By a show of hands, does anyone believe just by the fact that Mr. Franklin is an African-American male that he is guilty of the crimes that the State has charged him with?" Apparently, no one raised his or her hand and the court turned over the questioning to the State.

The State began by establishing that potential jurors come from three sources--driver's licenses, voter registration, and State IDs--and from that pool of people, a group is selected at random and summonses for jury duty are sent out to that group. The State then noted that having a jury of your peers is a constitutional right and asked the prospective jurors what "peers" means in that context, and if anyone thought other factors should be considered in jury selection. Juror No. 40 stated, "I don't know if this is what you mean, but when I look around, it doesn't seem like it's peers, so I feel like that should be considered when you're choosing people." After further discussion, the State pointed out that if, beyond driver's licenses, voter registration, and State IDs, you have a system that takes into consideration things such as race, age, religion, et cetera, it becomes a slippery slope. The State said,

> [I]f we start considering one particular factor, where does that consideration stop? Do we look at age? Do we look at address? Do we look at where you went to school? Do we look at how far you went in school?
>
> So that's why there's that very broad definition of peer, where we're looking at basically anybody within . . . Douglas County . . . that has a driver's license, voter registration, or State ID.

The State then asked if based on how the system is, would it affect anyone's ability to be fair and impartial in the proceedings; apparently no one responded in the affirmative.

The State proceeded to ask the potential jurors if they knew anyone involved in the case. Discussion was had with four or five potential jurors. Juror No. 11 then stated she may have worked with one of the witnesses in the past. When asked if she could be fair to both sides, the following colloquy took place.

> [Juror No. 11]: Yes. Can I say something?
>
> [The State]: Certainly.
>
> [Juror No. 11]: I don't think that Black men often times get a fair trial because it would be a lot of White people that be judging them, and they judge by their experiences. And my experience with my family members, my brothers, nephews, and cousins that's been in trouble, they don't get a fair trial because the people that are judging them, the jurors and stuff, they, you know, look at them as a criminal right away, and that's just my comment.
>
> [The State]: Okay. Can I just follow up with you a little bit on that[?] So these numbers, admittedly, are a little bit old, but the census, which is taken every ten years, last taken in 2010, and we're still waiting for the results of the 2020 census, excuse me, you know, if we're looking by population in 2010, we're looking at Omaha being -- and I should say Douglas County being roughly 73.1 percent White, and then another 13.7 percent African-American, and the remainder being made up by a multitude of other ethnicities. Understanding that it's sort of a random group that is selected to make up the 40 here, if

you just sort of look around, based on those numbers, you know, do you think there is something inherently unfair with what we're working with today?

[Juror No. 11]: I don't know.

[The State]: If you -- Be perfectly honest. There's nothing wrong with that, as long as you're being honest.

[Juror No. 11]: What I think is, if that was my son or my brother or my family, I wouldn't be too sure that he would get a good chance right now, that y'all picked all of these people right here, 12 people.

[The State]: So then with that being considered, you know, as I posed to [juror No. 40], when we're trying to select a prospective jury, you know, should we take into consideration, say, the race of the victims?

[Juror No. 11]: I'm not trying to make an argument about that. I was just giving my opinion of the way I feel and my experience.

[The State]: Okay.

[Juror No. 11]: That's all.

[The State]: Which I very much appreciate that.

[Juror No. 11]: I don't know how y'all should do it to make it better, but it just seems like it's just not -- it's kind of way to the other side.

[The State]: Again, I don't have a suggestion for a better way either. That being said, if you are selected for this -- this jury, you know, can you sort of agree that you're not going to be, you know, say, more favorable to Mr. Franklin because of his race?

[Juror No. 11]: Yeah. I would go by the evidence, but I'm just saying that.

[The State]: So you agree you'll follow the instructions?

[Juror No. 11]: Oh, yeah.

[The State]: Okay. In that case, thank you, [juror No. 11].

Before I move too past [juror No. 11], anybody have similar feelings that she does to the jury selection process? Sort of touched on this once but just want to make sure I've gotten everybody. . . . [Juror No. 34]?

. . . .

[Juror No. 34]: Yes. I just kind of agree with what she says.

[The State]: So then I'll pose to you the same question. Because of those experiences, because of those feelings, do you think that it's possible you may, you know, lean one way more favorable or less favorable to the defendant?

[Juror No. 34]: No, I don't.

[The State]: More favorable or less favorable to the State?

[Juror No. 34]: No. I'll just listen to what is being said and take it from there. I wouldn't say that any of my decision would be based on that.

[The State]: You can agree to follow the instructions that will ultimately be provided to you by [the judge]?

[Juror No. 34]: Yes, sir.

[The State]: Thank you, [juror No. 34].

The State then resumed its questioning of the potential jurors regarding whether they knew anyone involved in the case, and other matters. Once the State finished its questioning, the defense took its turn.

During the defense's questioning, the following occurred.

[Defense counsel]: . . . So now we're going to deal with the elephant in the room. Will all the black African-American males in the 40 jury pool please stand up. Let the record reflect there were no African-American males in the 40-person jury pool. [Juror No. 40], you talked about that, and I appreciate that. So do you understand why I am worried, Mr. Franklin is worried, his family is worried?

[Juror No. 40]: Yeah.

THE COURT: Okay. Tell me about that.

[Juror No. 40]: Well, if it was my child, I'd be worried, just because I think in any situation, if I was on trial, if there were none of my peers in the jury, I would feel very uncomfortable or would not feel -- have confidence that it would be a fair trial.

[Defense counsel]: So, you know, the State -- and I understand what they're trying to say, that, well, it's a slippery slope when we start trying to find a jury of your peers, when we're -- like, well, who do we select for religion? Right? That was one of the things that they asked you. Can you tell Mr. Franklin's religion?

[Juror No. 40]: No.

[Defense counsel]: But you can tell his race?

[Juror No. 40]: Yeah.

[Defense counsel]: And you can tell everybody's [sic] else's race?

[Juror No. 40]: Yeah.

[Defense counsel]: It's something that's obvious.

[Juror No. 40]: It is.

[Defense counsel]: And why don't [sic] we worry about that? I mean, it's obvious, but let's say it.

[Juror No. 40]: Because we all have unconscious bias.

[Defense counsel]: Okay. So what's my fear or what's Mr. Franklin's fear regarding that unconscious bias?

[Juror No. 40]: That he's going to be seen as guilty before proven guilty.

[Defense counsel]: Okay. All right. Thank you. [Juror No. 11], you raised that. I want to talk about that. I hate to put you on the spot, and I'm sorry, but, you know, at this point, you're the spokeswoman. I'm sorry. I'm sorry. No, I'm sorry.

[Juror No. 11]: What are you asking me?

[Defense counsel]: What is my fear? What's Mr. Franklin's fear?

[Juror No. 11]: That he won't get a fair trial.

[Defense counsel]: Why?

[Juror No. 11]: Because there's no people that look like him that's in his, like, age group and a Black man that could kind of have some of his experiences. I mean, you know, give him a fair -- a fair look at everything. You know what I'm saying?

[Defense counsel]: Uh-huh. And, again, let's call it for what it is. What are we worried about when we're dealing with race in a jury system?

[Juror No. 11]: Prejudice.

[Defense counsel]: Okay. Did you grow up in Omaha?

[Juror No. 11]: Uh-huh.

[Defense counsel]: Okay. What's your experience?

[Juror No. 11]: I've been -- I had went to an all White school. I had got transferred. And all the -- They called me the N word every day, and I had to fight, and it's just crazy. My brother used to get in trouble, and he always -- they never thought that he didn't do it. They always thought he did whatever it was, you know. And I just think that in Omaha, we got more Black men that it could be at least one or two in here, you know, so he could get a fair trial. I don't want to be a part of it because I don't think he's going to get a fair trial. I mean, you know, I don't want to -- you know, if he did something and all the evidence is there, you have to go by what the evidence is, but if you just have a prejudice against someone because of their color, then you won't even give them a fair chance. That's what I feel.

[Defense counsel]: Has your experience been that you've had encounters with White people who think that they're not prejudiced or think that they don't have a bias but they do?

[Juror No. 11]: Yeah.

[Defense counsel]: Tell me about that.

. . . .

[Juror No. 11]: Sorry. When I worked at [a corporation], I was invited to my boss's house, and they have a swimming pool, and they were drinking and stuff. And the girl said, Well, we only invited you so you could make our drinks. And everybody just went, Oh, they couldn't believe she said that. But, you know, I was upset about it, but I didn't beat her up. So, I don't know, it's just stuff, you know. People act like they like you, but then really behind your back they're saying stuff, Oh, you people, you know, or they think you always do the same -- all y'all do that, you know. And I'm not trying to say that there's no White people or people of different nationalities or whatever that could be fair. I'm just saying that to make it fair for him, there should be some people like him in the jury.

[Defense counsel]: So we're here today, and I guess, do you have any idea beyond -- I mean, we have the jury panel we have.

. . . .

What do we do?

. . . .

[Juror No. 11]: I don't know. I guess try to pick from the people that you know that are closer to his age maybe. I don't know how y'all pick them.

[Defense counsel]: Thank you for your time. I really appreciate you.

Questioning continued with the potential jurors. Later, defense counsel said, "I guess I want to know if there's anybody else who feels like, I'm going to be too distracted . . . for whatever reason, that I don't feel like I can give full deliberations to this case." Juror No. 11 again spoke up.

[Juror No. 11]: I don't feel it's fair. I mean, I don't think he's being -- the people, you know, his peers, and you asked me what I think we should do about it. I was kind of

looking around and seeing if you could kind of choose some people that are not -- a couple of, you know, a couple Black ladies, some other nationalities in here, so it could be more fair. That's what I, you know -- It's just kind of making me feel like it's not going to be fair.

[Defense counsel]: Okay.

[Juror No. 11]: Not to say that they can't be fair and impartial, but he's one year older than my son. And if that was my son, I would want at least a couple of Black men in here to be on the jury. That's what I would want.

[Defense counsel]: Thank you.

Jurors were asked if they could hold out if they felt the State had not proven their case beyond a reasonable doubt even if the other jurors felt the case had been proven. Juror No. 6 stated, "I don't know how to respond to that, other than I agree with her, you now, just it's not going to be fair." Juror No. 6, after stating he felt that he would be overcome by the group, eventually stated he would make his own decision even if he was 1 out of 12.

After the questioning concluded, the State and the defense exercised their challenges to the potential jurors, but none of those challenges (for cause or peremptory) appear in our record. Nor does our record indicate which side used its peremptory challenges on which potential jurors, except for what can be gleaned from the discussion and arguments during the *Batson* challenge.

Franklin raised a *Batson* challenge on the record, but outside the presence of the jury. The following colloquy was had:

[Defense counsel]: Your Honor, we are making a challenge to a preemptory [sic] strike of the State on the basis of Batson. The State, for their fourth strike, struck . . . Juror No. 11. She is African-American. The State, as its sixth strike, struck . . . [juror No.] 18. She is also African-American. This leaves the sole African-American as . . . [juror No.] 34, on the jury. And [sic] especially struck by the fact that [juror No. 11] was struck when she raised how unfair the jury panel was, given its racial makeup, so we would challenge.

[The State]: Judge, I think per Batson there needs to be a preliminary finding that the defense or whoever is raising the Batson challenge has met the prima facie showing that there is, in fact, a race-motivated basis for the strikes. Two out of three, I don't think, necessarily satisfies that. So on that, I guess it's up to the Court if they feel -- if the Court feels the defense has made that prima facie showing.

THE COURT: I guess I'm not understanding clearly what the defense is saying in terms of --

[Defense counsel]: So my concern is that [juror No. 11] looks around the jury panel room, sees that there are no other African-Americans, notes this, and as a basis of pointing out that this is a not racially diverse panel and pointing out that this doesn't appear to be fair to her, she ends up getting struck, and she's African-American. And [juror No. 18], who also, I think, joined in [juror No. 11's] concern, also is struck, too, for pointing out what is obvious, that there aren't African-Americans in proportion to the percentage of this particular population. As [the State] said, 13 percent of the population is African-American, and yep [sic], we have a panel that has one African-American. That's not 13 percent. And

- 11 -

not that we have to have a percentage, but it's certainly not a fair jury if we're striking African-Americans for pointing out that this is racist.

THE COURT: I guess I will find that the defendant has not met the burden, prima facie burden under Batson, that one of the jurors that appears to be remaining, [juror No. 34], was actually the juror that agreed with what [juror No. 11] had said, and [juror No. 34] is still remaining as a juror, which in the Court's view, goes against the Batson challenge. And in addition, the Court is not going to hold the State regarding the percentages of Douglas County and the percentages of jurors who are in the prospective jury panel. I'm not going to attribute that to the State in any fashion. And so the Court will deny on the defendant's Batson challenge, but the defendant's record is made in that regard.

### (c) Arguments on Appeal

Franklin argues:

[T]he record shows that there were three African-Americans amongst the prospective 45 jurors. . . . The State struck two out of the three prospective African-Americans when it struck [juror No. 11] and [juror No. 18], or 66 percent of the African-American prospective jurors. There is an inference of discrimination from the percentage of African-American's struck and by striking the particular African-American who expressed interest in seeing that racial balance be obtained on a jury. See *Foster v. Chatman*[, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016)]. The trial court clearly erred in failing to reinstate [juror No. 11] and [juror No. 18], as they were not struck for a racially neutral reason, and as a result, the error created reversible harm.

Brief for appellant at 17.

As stated previously, determining whether a prosecutor impermissibly struck a prospective juror based on race is a three-step process. *State v. State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). See, also, *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). In this three-step process, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *State v. Briggs, supra.* First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of race. Second, assuming the defendant made such a showing, the prosecutor must offer a race-neutral basis for striking the juror. And third, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Id.* The instant case never got past the first step because the district court determined that Franklin had not met his prima facie burden.

In *Batson v. Kentucky, supra*, the Supreme Court stated:

[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to

discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson v. Kentucky*, 476 U.S. at 96-97, 106 S. Ct. at 1723 (internal citations omitted). See, also, *State v. Rowe*, 228 Neb. 663, 423 N.W.2d 782 (1988) (to make a prima facie case under *Batson*, criminal defendant must show (1) she or he is a member of a cognizable racial group, (2) prosecutor used peremptory challenges to remove members of defendant's race from venire, and (3) facts and other relevant circumstances give rise to inference that prosecutor used those challenges to exclude potential jurors because of their race).

During his *Batson* challenge, Franklin, a Black male, claimed that the State struck two out of the three Black jurors. Specifically, regarding juror No. 11, Franklin argued that she was struck after she pointed out that the panel was not racially diverse and, in her opinion, that did not appear to be fair. Regarding juror No. 18, Franklin argued she was struck because she shared juror No. 11's concern, "that there aren't African-Americans in proportion to the percentage of this particular population." However, as noted by the district court, it was juror No. 34 that shared juror No. 11's concern, and juror No. 34, a Black person, remained on the jury.

Additionally, on our de novo review of the record, we note that juror No. 6 and juror No. 40, who were not Black, both expressed agreement with juror No. 11 and were both struck, although we do not know by whom or whether they were struck for cause or peremptorily. Evidence that a prosecutor's reasons for striking a Black prospective juror apply equally to an otherwise similar non-Black prospective juror, who is allowed to serve, tends to suggest purposeful discrimination. See *Foster v. Chatman*, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016). However, those facts do not exist in this case and thus cannot serve to suggest purposeful discrimination.

The only remaining argument is that striking two out of the three potential Black jurors left a percentage of Black jurors less than the percentage of the area's Black population. The district court stated that it was not going to hold the State "regarding the percentages of Douglas County and the percentages of jurors who are in the prospective jury panel"; "I'm not going to attribute that to the State in any fashion." The court found that Franklin had not met his prima facie burden under *Batson*.

Although the district court's explanation is puzzling, based on this court's review of the record as set forth above, we cannot say that the district court clearly erred in finding that Franklin had not made a prima facie case under *Batson*. See *State v. Covarrubias*, 244 Neb. 366, 507 N.W.2d 248 (1993) (using clearly erroneous standard to review trial court's determination that defendant failed to make prima facie case under *Batson*; found no clear error), *overruled on other grounds, State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995).

### 3. ADMISSIBILITY OF 911 RECORDINGS

Franklin claims the district court erred in admitting the recordings of three 911 calls into evidence because they were inadmissible hearsay and no facts sufficient to establish foundation for an excited utterance exception were introduced. All three 911 calls were made after Justin Cramer was shot during an attempted robbery.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2020). Hearsay is not admissible except as provided by these rules, by other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of the Supreme Court. Neb. Rev. Stat. § 27-802 (Reissue 2016). Section 27-803(2) (Supp. 2021) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is "not excluded by the hearsay rule." For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant under the stress of the event. *State v. Nolt*, 298 Neb. 910, 906 N.W.2d 309 (2018). The key requirement is spontaneity, which requires a showing that the statements were made without time for conscious reflection. *Id*. An excited utterance does not have to be contemporaneous with the exciting event. *Id*. It may be subsequent to the event if there was not time for the exciting influence to lose its sway. *Id*. The true test is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event. *Id*.

### (a) Brotherton's 911 Call

Sandra Brotherton gave her address and testified that she lived directly across the street from Cramer. On the evening of July 27, 2018, Brotherton was home watching television with her husband and heard Cramer working on a car across the street. Later she heard a gunshot and called 911; the 911 dispatcher said that someone had already called in and reported it and that officers were on their way. After Brotherton hung up the phone, she heard two more shots. The recording of Brotherton's 911 call was then received into evidence over Franklin's objection "for lack of foundation or exception under the hearsay rule."

In the recording of the 911 call, Brotherton gave her address and said "we just heard a couple of gunshots outside." The 911 dispatcher responded by saying that they had another call so officers were already on the way.

Here, the startling event was hearing gunshots fired outside her residence, and Brotherton's statement related to that event. Brotherton's statements were also made under the stress of the event. Under the circumstances, the excited utterance exception to the hearsay rule applied. Even

assuming the 911 recording was inadmissible hearsay, any error was harmless because it was cumulative to Brotherton's testimony at trial and there was other competent evidence to support Franklin's convictions (e.g., Cramer identified Franklin as the shooter, and there was DNA and ballistic evidence tying Franklin to the crimes). See *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017) (where evidence is cumulative and there is other competent evidence to support the conviction, improper admission or exclusion of evidence is harmless beyond a reasonable doubt).

### (b) Bass' 911 Call

Shalonda Bass testified that she lived next door to Brotherton. On the evening of July 27, 2018, Bass was smoking a cigarette on her front porch. She saw a charcoal-colored sedan parked on the wrong side of the street. A black male in all white clothing got out of the sedan, walked up to Cramer's residence, and approached Cramer's vehicle. Bass heard "some cussing" and then saw "the sparks from the gun" when the man shot Cramer. Bass "ran in the house and called the police." The recording of Bass' 911 call was then received into evidence over Franklin's objection for "lack of foundation and relevancy for the purpose of laying foundation for a hearsay exception."

In the recording of the 911 call, Bass gave her address, said someone just shot her neighbor, she "watched them" shoot twice; she said it was a black man in all white and he drove away in a gray car. When the dispatcher said that help was on the way, Bass said to "please hurry." Bass can also be heard yelling, "Is he dead? Oh my God. Sandy, go in the house because that boy is shooting!"

Here, the startling event was Bass seeing a man shoot at her neighbor, and Bass' statements during the 911 call related to the shooting. Bass' statements were also made under the stress of witnessing the shooting. Under the circumstances, the excited utterance exception to the hearsay rule applied. Even assuming the 911 recording was inadmissible hearsay, any error was harmless because it was cumulative to Bass' testimony at trial and there was other competent evidence to support Franklin's convictions. See *State v. Mora, supra*.

### (c) Stephanie Cramer's 911 Call

Stephanie Cramer (Stephanie), now married to Justin Cramer (Justin), testified that in July 2018 she and Justin were not yet married, but were living together. On the evening of July 27, she went downstairs and "hear[d] Justin kind of gurgling talk, trying to say, I've been shot, I'm dying, and he just kept repeating it." Stephanie saw Justin "barricading himself behind the front door so nobody could get in," "[h]e was laying on the ground rolling himself against the door." Justin "was screaming, Don't -- He's coming in. He's coming in. Don't let him in." Stephanie said she "[saw] holes in [Justin's] jeans, and blood was coming out of his jeans, and blood was coming out of his arm and his chest and his back." She sat down beside him, held his head, and called 911. The recording of Stephanie's 911 call was then received into evidence over Franklin's foundation, hearsay, and relevance objections.

In the recording of the 911 call, Stephanie can be heard crying and saying, "He just got shot." "Did someone shoot you?" "Oh my god. I need help!" She gave her address. She said, "Somebody drove by and shot him!" She said he had been shot "in the back right by his heart and his arms." She is then heard saying, "Justin are you okay? Somebody is knocking at the door. Is that who shot him? I don't know. I need help!" In response to the dispatcher's question, Stephanie

said the blood was "pouring" out of the wounds. A neighbor arrived and was going to take over the 911 call; that is where the recording ended.

Stephanie further testified that during the 911 call she heard someone knocking on the door, she thought it was "[w]hoever shot [Justin]." Stephanie "thought [Justin] was dying," "[h]e was just barricaded against the door and didn't say anything." It turned out that it was a neighbor trying to get in the house, and when she got inside Stephanie gave her the phone to talk to the 911 dispatcher. Stephanie, who used to be an ER nurse, said, "I thought it was more important for me to tell Justin that I loved him than it was to talk to 911. I didn't think he was going to make it, and I wanted him to know how much I loved him."

Here, the startling event was Stephanie finding Justin shot and bleeding, her statements related to that event, and her statements were clearly made under the stress of the event. Under the circumstances, the excited utterance exception to the hearsay rule applied. Accordingly, the district court did not abuse its discretion in admitting the recording of Stephanie's 911 call into evidence.

### 4. Plain Error in Sentencing

Although not raised by either party, we note issues of plain error regarding the sentences in both cases. Plain error may be found on appeal when an error unasserted or uncomplained of at trial is plainly evident from the record, affects a litigant's substantial right, and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). We find that such errors exist in the sentencing in both cases before us, and we therefore vacate all sentences and remand for resentencing.

Two hearings took place related to sentencing, one on June 21, 2021, and another on June 23. On June 21, the district court initially received certified copies of Franklin's prior convictions and found that Franklin was a habitual criminal. This required that Franklin's felony convictions be punishable by a mandatory minimum term of 10 years' and a maximum term of not more than 60 years' imprisonment, unless a greater punishment was otherwise provided by statute, then the law creating the greater punishment would govern. See § 29-2221(1). However, to seek a habitual criminal enhancement, it must be charged in the information. Section 29-2221(2) states that "[w]hen punishment of an accused as a habitual criminal is sought, the facts with reference thereto shall be charged in the indictment or information which contains the charge of the felony upon which the accused is prosecuted." See, also, *State v. Davis*, 199 Neb. 165, 170, 256 N.W.2d 678, 681 (1977) ("We have categorically held where punishment of an accused as a habitual criminal is sought, the facts with reference thereto must be charged in the indictment or information."). "[T]he essential allegations which an information must contain for a charge under the Habitual Criminal Act are that said person has been (1) twice previously convicted of a crime, (2) sentenced, and (3) committed to prison for terms not less than 1 year each." *State v. Harig*, 192 Neb. 49, 55, 218 N.W.2d 884, 889 (1974).

Similar to the circumstances in the present case, in *State v. Davis, supra*, the defendant had two separate cases filed against him that were consolidated for a jury trial; one case charged three counts (two felony counts and one count related to defendant being a habitual criminal) and the other case alleged a single felony count. After being found guilty of all felony charges under both informations, the district court found the defendant to be a habitual criminal and sentenced the defendant to concurrent terms of 15 to 45 years' imprisonment on the multi-count information and

a concurrent term of 5 years' imprisonment on the single-count information. Only the multicount amended information alleged the defendant was a habitual criminal. The Nebraska Supreme Court found the "habitual criminal count" to be "fatally defective" because the "amended information charged the defendant with only one prior felony conviction and sentence of imprisonment." *Id.* at 170, 256 N.W.2d at 681. In reaching that decision, the court rejected the State's argument that the deficient information was immaterial since the defendant had "admitted in open court that he was guilty of at least five felonies, and [the defendant] raised no objection at the hearing on the sufficiency of the information." *Id.* The Supreme Court concluded that the sentences in the multicount amended information were "invalid and must be set aside and the cause remanded for resentencing." *Id.* With regard to the defendant's sentence in the single-count case, the Supreme Court noted that the sentence was initially determined under the habitual criminal act, but that the trial court subsequently set aside the initial sentence because the operative information in that single-count case did not contain a habitual criminal count (it had been included in an amended information but was subsequently withdrawn). The Supreme Court found the 5-year sentence in that single-count case to be a valid sentence and affirmed that conviction and sentence.

The record before us indicates that Franklin was only charged as a habitual criminal in the State's amended information in case No. A-21-607 (CR 18-3497), and not in the information in case No. A-21-605 (CR 18-3610). Therefore, the district court erred in applying the habitual criminal enhancement in case No. A-21-605 (CR 18-3610). This error serves as one basis for vacating the sentences in case No. A-21-605 (CR 18-3610), but as discussed next, other grounds exist for vacating all sentences in both cases and remanding for resentencing.

On June 21, 2021, the district court also found that the conviction for possession of a weapon by a prohibited person in case No. A-21-607 (CR 18-3497) should be enhanced to a second offense, which made it a Class IB felony, thus increasing the sentencing range to 20 years to life imprisonment. See, Neb. Rev. Stat. § 28-105 (Cum. Supp. 2020); § 29-2221(1). As to that conviction, the court sentenced Franklin to 20 years to 20 years and 1 day of imprisonment. On each of the other seven felony convictions in the two cases, the court sentenced Franklin to 10 years to 10 years and 1 day of imprisonment. There is not necessarily error in these sentencing terms. However, in addition to the habitual criminal matter addressed above, a problem arose when the court referred to incorrect "counts" and attempted to identify which sentences would run concurrently versus consecutively. The court stated that "those sentences on the non-use[:] the robbery, the possession of a deadly weapon by a prohibited person, the operating a motor vehicle to avoid arrest, the first degree assault, and the attempted robbery, all those sentences will run concurrent." The court further indicated that it wanted the "use of a deadly weapon charges to run concurrent to each other but then consecutive to the other five sentences." However, the court wanted to clarify whether it could run the use of a deadly weapon sentences concurrently to each other.

In a subsequent hearing on June 23, 2021, the district court stated that running the use of a deadly weapon sentences concurrent with each other was unlawful pursuant to § 28-1205(3), which requires sentences for use of a deadly weapon to run consecutive to each other and to any other sentence. See, § 28-1205(3) (crimes defined in this section shall be treated as separate and distinct offenses from the felony being committed, and "sentences imposed under this section shall be consecutive to any other sentence imposed"); *State v. Johnson*, 308 Neb. 331, 358, 953 N.W.2d

772, 791 (2021) (sentences for weapons convictions under § 28-1205 are statutorily required to be "served consecutively to one another and to all the other sentences imposed"); *State v. Ramirez*, 287 Neb. 356, 384, 842 N.W.2d 694, 715 (2014) (plain error in sentencing; "[b]ecause § 28-1205(3) mandates that the sentence imposed for a conviction of use of a deadly weapon be consecutive to any other sentence and concurrent with no other sentence," district court "did not have the authority to order that the sentences for the convictions of use of a deadly weapon to commit a felony, counts II, IV, and VII, run consecutively only to the sentences for the underlying felony offenses); *State v. Scott*, 284 Neb. 703, 728, 824 N.W.2d 668, 690 (2012) ("our appellate courts have accorded plain meaning to this statute and have held that a sentence for use of a deadly weapon must be served consecutively to other sentences and not concurrently with any sentence").

The district court then proceeded to "set aside and vacate the sentences imposed on Count 3 and Count 4" in CR 18-3610 and resentenced Franklin to the same term of 10 years to 10 years and 1 day on each count, and then indicated they would run consecutive to each other and to "Count 1 and Count 2 that were already imposed on CR 18-3610." However, "Count 3 and Count 4," in CR 18-3610 related to attempted robbery (count 3) and use of a deadly weapon (count 4). It is evident the court intended to vacate the use of a deadly weapon convictions (counts 2 and 4), but erroneously referred to count 3 instead of count 2. The court then stated "for clarification sake," the sentences on Count 1 and Count 2 in CR 18-3610, will, as stated, "run concurrent with the sentences on Counts 1, 2, and 3, imposed on CR 18-3497." However, as previously indicated in this opinion, counts 1 and 2 in CR 18-3497 did not result in convictions; the concurrent sentences in CR 18-3497 applied to counts 3, 5, and 6. Further, the court did not address the use of a deadly weapon conviction (count 4) in CR 18-3497, which also needed to be corrected to reflect that it was to run consecutively to all other sentences. Because of the erroneous designations or omissions regarding concurrent and consecutive sentences, the court's oral pronouncements of Franklin's sentences in both cases were invalid.

Ordinarily, if a court's oral pronouncement of a sentence is invalid, then a court's written order correctly setting forth the sentence will control. See, *State v. Sorenson*, 247 Neb. 567, 529 N.W.2d 42 (1995) (ambiguous oral pronouncement of whether sentences were imposed consecutively or concurrently was invalid but validity was cured by court's written journal notation correctly setting forth consecutive sentences as required by relevant statute); *State v. Brauer*, 16 Neb. App. 257, 743 N.W.2d 655 (2007) (if oral pronouncement of sentence invalid but written judgment imposing sentence valid, written judgment considered controlling).

However, in this case, the confusion created by the oral pronouncements was not clarified or corrected by the written sentencing orders; instead, further errors occurred. While the sentencing terms set forth in the written orders correctly reflected the court's oral pronouncement of the terms for each sentence, the designation as to which counts would run concurrently versus those that would run consecutively were not accurate.

In CR 18-3497, the district court's written order states that an enhancement hearing was held and Franklin was found to be a habitual criminal. It then correctly indicates that counts 3 (robbery), 5 (possession deadly weapon, prohibited person), and 6 (operating motor vehicle to avoid arrest) would run concurrently. However, the order then incorrectly states that "Count VI shall run consecutive to Counts III, IV and V." It should have indicated that count 4 (use of a

- 18 -

deadly weapon) shall run consecutive to counts 3, 5, and 6. These errors left the order silent as to count 4 being required to be served consecutively in accordance with § 28-1205(3).

The written order in CR 18-3497 also gave credit for 1,061 days of time served, which by itself is not an error; it is a problem that the same credit for time served was also ordered in CR 18-3610, which we will discuss later.

In CR 18-3610, the district court's written order states that an enhancement hearing was held and Franklin was found to be a habitual criminal. As discussed previously, the information in this case did not charge Franklin with being a habitual criminal. Additionally, the order then initially refers, without specific "count" number references, to Franklin's convictions for first degree assault, attempted robbery, and two counts of use of a weapon to commit a felony. It then states:

> Sentence in Counts I, II shall run concurrent with Counts I, II and III in CR 18-3497; and the sentences in Counts III and IV shall run consecutive to each other and consecutive to Counts I and II; the sentences in Count III and IV in this case shall run consecutive to the sentences in CR 18-3497.

Credit was given for 1,061 days served. First, there were no convictions, and thus no sentences, for counts 1 and 2 in CR 18-3497. Also, count 2 in CR 18-3610 is a use of a deadly weapon conviction, which cannot run concurrently with any other sentence. To accurately reflect the court's intentions regarding the concurrent and consecutive nature of the sentences, the order should have indicated that counts 1 and 3 in CR 18-3610 would run concurrently with counts 3, 5, and 6 in CR 18-3497 (the 5 "non-use" convictions). The use of a deadly weapon convictions, counts 2 and 4 in CR 18-3610, would run consecutively to each other, and consecutively to all other sentences in both cases.

It is evident that once the district court correctly understood § 28-1205(3) to require consecutive sentences for all three of the use of a deadly weapon convictions, it attempted to make that correction at the second sentencing hearing. Unfortunately, the court's oral pronouncement included incorrect references and omissions related to the various counts, which the subsequent written orders further misstated.

An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced. *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017) (noting that while it is generally within trial court's discretion to direct that sentences imposed for separate crimes be served concurrently or consecutively, § 28-1205(3) does not permit such discretion in sentencing; all sentences vacated and remanded for resentencing). Accordingly, we vacate all sentences in both cases and remand for resentencing. And when resentencing, the district court should be clear about which sentences in both cases have mandatory minimum sentences.

Also, when resentencing, the district court is directed to make clear in the sentencing orders that the credit of 1,061 days for time served should only be applied once. See *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015) (presentence credit for time served is applied only once; when consecutive sentences are imposed for two or more offenses, periods of presentence incarceration may be credited only against aggregate of all terms imposed). See, also, *State v. Wines*, 308 Neb.

468, 954 N.W.2d 893 (2021) (when concurrent sentences are imposed, credit is applied once, and credit applied once, in effect, is applied against each concurrent sentence).

## VI. CONCLUSION

For the reasons stated above, we lack jurisdiction over Franklin's claim that his statutory right to a speedy trial was violated. We affirm the district court's decision denying Franklin's *Batson* challenge and its admission of the 911 recordings into evidence at trial. Accordingly, we affirm Franklin's convictions. However, because of plain error in Franklin's sentences, we vacate all sentences and remand both cases for resentencing in accordance with our opinion.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED FOR RESENTENCING.